AIR PRODUCTS & CHEMICALS, INC., Plaintiff and Respondent, v. FAIRBANKS MORSE, INC., Defendant and Appellant: HARTFORD STEAM BOILER INSPECTION & INSURANCE COMPANY, Intervenor-Respondent.*

*No. 364. Argued February 26, 1973.—Decided April 20, 1973.*
(Also reported in 206 N. W. 2d 414.)

* Motion for rehearing denied, with costs, on June 29, 1973.

194

For the appellant there were briefs by *David E. Beckwith, Maurice J. McSweeney, John R. Dawson* and *Foley & Lardner,* all of Milwaukee, and oral argument by *Mr. Beckwith* and *Mr. McSweeney.*

For the respondents there were briefs by *Quarles, Herriott, Clemons, Teschner & Noelke* and *Laurence C. Hammond, Jr.,* and *Ross R. Kinney,* all of Milwaukee, and oral argument by *Mr. Hammond.*

HANLEY, J. Four issues are presented on this appeal:

1. Is the four-year Pennsylvania statute of limitations a defense to any or all of Air Products' or Hartford's causes of action?

2. Can a contract which states that liquidated damages "shall be in addition to any and all other remedies of buyer" be interpreted to mean that liquidated damages is the buyer's sole and exclusive remedy?

3. Under Pennsylvania law can limitation of liability provisions contained in the seller's "acknowledgments of order" become terms in the contracts of sale when the buyer's purchase orders contained no such terms and the buyer never expressly agreed to such terms?

4. Under Pennsylvania law, is the tort doctrine of strict liability applicable to either economic losses caused by unreasonably defective products or products which are unreasonably dangerous to themselves which in fact injure themselves and cause economic losses?

*Applicable statute of limitations.*

As an affirmative defense pleaded in its answer, Fairbanks set up Pennsylvania's four-year statute of limitations governing breaches of contract. The conflict arises because Wisconsin's statute of limitations in contract actions is six years. All parties agree that the remaining three issues must be resolved under Pennsylvania law.

In sustaining the demurrers of Air Products and Hartford to the statute of limitations affirmative defense of Fairbanks, the trial court concluded that each state must determine for itself the period of time in which a suit for a particular claim can be brought; and that the "center-of-gravity" approach to conflicts questions which was originally adopted by this court in *Wilcox v. Wilcox* (1965), 26 Wis. 2d 617, 133 N. W. 2d

408, is too unpredictable to be used when the fundamental question of the appropriate statute of limitations is at issue. We agree with the trial court's ruling on the statute of limitations issue. However, we think the choice of law is a matter to be decided on the basis of the existing conflicts rules of this court.

In the case of *Wilcox v. Wilcox, supra,* this court broke new ground in the choice-of-law area by abandoning the very mechanical *lex loci* rule in matters involving the appropriate torts law to be applied when that of Wisconsin's is in conflict with one or more other interested jurisdictions. Following *Wilcox,* in the case of *Heath v. Zellmer* (1967), 35 Wis. 2d 578, 151 N. W. 2d 664, the rationale of *Wilcox* was refined such that when:

". . . faced with a choice-of-law decision, this court should base its conclusions upon the following choice-influencing considerations . . .
"Predictability of results;
"Maintenance of interstate and international order;
"Simplification of the judicial task;
"Advancement of the forum's governmental interests;
"Application of the better rule of law." *Heath, supra,* at page 596.

Although the court put no limits on the scope of what has come to be known as the "center-of-gravity" or "grouping-of-contacts" approach, a few short years later in *Urhammer v. Olson* (1968), 39 Wis. 2d 447, 159 N. W. 2d 688, it specifically and again with very broad language, extended it to contract cases. At page 450, the court stated:

"We now adopt the grouping-of-contacts approach for the resolution of conflicts questions pertaining to the validity and rights created by the provisions of a disputed contract."

Since the decision in *Urhammer,* the court has used the "grouping-of-contacts" approach in *Haines v. Mid-*

*Century Ins. Co.* (1970), 47 Wis. 2d 442, 177 N. W. 2d 328, another contracts case.

In the very recent case of *Hunker v. Royal Indemnity Co.* (1973), 57 Wis. 2d 588, 204 N. W. 2d 897, this court set forth with clarity the approach which we will follow in choice-of-law questions relating to tort and we reaffirm that approach in the case at bar.

Although the five choice considerations stated above should all be given due consideration in the ultimate outcome of any choice-of-law question, this court should not engage in a mere "counting of these considerations" but rather look to the "relevancy" of the particular consideration in terms of the policies which the forum deems important, *vis-a-vis*, other contact states. *Wilcox, supra*, at page 633.

Regardless of the fact that it would be difficult to underestimate the importance of "predictability" as it relates to this case, it appears that when the policy behind statutes of limitations is examined, the most important are the second and fourth considerations: "Maintenance of Interstate and International Order; and Advancement of the Forum's Governmental Interests."

There can be no question but that the underlying purpose in the enactment of a statute of limitations is to protect defendants and the courts from ". . . stale claims springing up at great distances of time, and surprising the parties . . ." when all the evidence, once vivid, has since become obscure. *Bowe v. LaBuy* (1934), 215 Wis. 1, 3, 253 N. W. 791. The same essential policy considerations have guided the Pennsylvania courts as well. *Schmucker v. Naugle* (1967), 426 Pa. 203, 231 Atl. 2d 121.

A determination that Wisconsin's six-year statute controls would in no way affect any legitimate interest of Pennsylvania since their statute, like ours, is designed to protect defendants and in this case, Air Products,

the Pennsylvania resident, is the plaintiff—not the defendant. Likewise, Pennsylvania is in no position to in any way influence what Wisconsin feels to be an appropriate period of protection for both itself and defendants from stale lawsuits. *Wilcox v. Wilcox, supra,* at page 634.

Moreover, by the decision of the legislature to permit aggrieved parties six instead of four years to prosecute their claims, a decision contrary to the recommended period by drafters of the Uniform Commercial Code which was ultimately adopted in Pennsylvania, the legislature determined that the interests of Wisconsin are best advanced by a longer period. We affirm the order sustaining demurrers to defendants' affirmative defenses based on the statute of limitations.

*Liquidated damages provision of Air Products' purchase orders.*

The liquidated damages provisions of Air Products' purchase order provide as follows:

"Liquidated Damages:
"Delay in delivery
"Seller recognizes that failure to make delivery of drawings and other data or equipment conforming to the requirements of this purchase order in accordance with the delivery schedule contained in this purchase order will subject buyer to substantial damages due to delay and disruption of work schedules, inefficient use of manpower and other reasons, and that the amount of such damages will be difficult or impossible to ascertain with certainty. Seller, therefore, agrees that such damages shall be assessed and payable, as agreed and liquidated damages, and not as a penalty, in accordance with the schedule set forth at the end of this clause.

"Any other provision hereof to the contrary notwithstanding, no item required to be delivered hereunder shall be deemed delivered unless the same conforms to the requirements of the order and, (a) in the case of drawings and other data, is mailed or otherwise delivered

to buyer's offices at Allentown, Pennsylvania [and any other specified receivers] on or before the date specified, and, (b) in the case of equipment, is placed in the hands of a carrier for delivery via the most direct route to the destination indicated on the purchase order, on or before the date specified. In any case of partial delivery of an item, if permitted hereunder, the item shall not be deemed as received for purposes of this provision, until delivery of the last item required for its use, or installation, and operation. Unless otherwise provided, all time shall be computed on the basis of calendar days elapsing after the delivery date specified. Liquidated damages shall be computed for each item listed on the schedule separately.

"Buyers right to liquidated damages provided for herein shall be in addition to any and all other remedies of buyer, including, without limitation, its rights under paragraph 9 of the terms and conditions of this purchase order for default. In the event of any termination for default, liquidated damages for delay shall be computed, up to the maximums provided herein, to the date buyer places a new purchase order for the items covered by this order.

"In the event buyer shall be prevented from making delivery for reasons defined in paragraph 10 of the terms and conditions of this purchase order, seller shall grant such extension of the delivery schedules as shall, in its opinion, be justified, not to exceed in any event, however, the actual number of days such conditions is determined to have existed."

Readily apparent from a reading of the above provision is that it initially provides for the assessment of liquidated damages in case of failure by defendant to make delivery of equipment conforming to the specifications within the times set forth in the delivery schedule. The provision next provides that the right to recover liquidated damages as specified in an attached schedule "shall be in addition to any and all other remedies of the buyer."

The trial court concluded that the separate provisions were "inconsistent and ambiguous" and that on their

face it cannot be determined as a matter of law whether Air Products is entitled to recover its full and actual damages or whether plaintiff's recovery is limited to the liquidated damages established in the contract and, therefore, "[a] construction of these contracts, if one is needed, cannot be properly effected by demurrer, but must be done at trial."

The trial court was evidently relying on the rule of law that "[w]hen the language of a contract, considered as a whole, is reasonably or fairly susceptible to different constructions, it is therefore ambiguous, and such being the situation, the sense in which the words are therein used is a question of fact." *Lemke v. Larsen Co.* (1967), 35 Wis. 2d 427, 432, 151 N. W. 2d 17.

We agree with the trial court's conclusion that the separate provisions relating to liquidated damages are inconsistent and ambiguous. We affirm the order overruling this demurrer.

*Limitations of liability provisions in Fairbanks' acknowledgments.*

As an affirmative defense to all the causes of action pleaded by both Air Products and Hartford, Fairbanks set up a provision contained in its "acknowledgments of order" which were sent by Fairbanks to Air Products with Air Products' purchase order which it had executed. The "acknowledgment of order" from Fairbanks to Air Products has the following language printed in reasonably bold face type at the bottom:

"WE THANK YOU FOR YOUR ORDER AS COPIED HEREON, WHICH WILL RECEIVE PROMPT ATTENTION AND SHALL BE GOVERNED BY THE PROVISIONS ON THE REVERSE SIDE HEREOF UNLESS YOU NOTIFY US TO THE CONTRARY WITHIN 10 DAYS OR BEFORE SHIPMENT WHICHEVER IS EARLIER.

"BEFORE ACCEPTING GOODS FROM TRANSPORTATION COMPANY SEE THAT EACH ARTICLE

IS IN GOOD CONDITION. IF SHORTAGE OR DAM-
AGE IS APPARENT REFUSE SHIPMENT UNLESS
AGENT NOTES DEFECT ON TRANSPORTATION
BILL. ACCEPTANCE OF SHIPMENT WITHOUT
COMPLYING WITH SUCH CONDITIONS IS AT YOUR
OWN RISK.

"THIS IS NOT AN INVOICE. AN INVOICE FOR
THIS MATERIAL WILL BE SENT YOU WITHIN A
FEW DAYS.

## "ACKNOWLEDGMENT OF ORDER"

On the reverse side of the "acknowledgment of order"
there are printed six separate provisions which are ap-
propriately numbered and at the very beginning it is
stated that:

"The following provisions form part of the order
acknowledged and accepted on the face hereof, as express
agreements between Fairbanks, Morse & Co. ('Com-
pany') and the Buyer governing the terms and condi-
tions of the sale, subject to modification only in writing
signed by the local manager or an executive officer of
the Company:"

Provision 6 which is the subject of the dispute between
the parties provides that:

"6.—The Company nowise assumes any responsibility
or liability with respect to use, purpose, or suitability,
and shall not be liable for damages of any character,
whether direct or consequential, for defect, delay, or
otherwise, its sole liability and obligation being confined
to the replacement in the manner aforesaid or defectively
manufactured guaranteed parts failing within the time
stated."

Fairbanks contends that provision 6 contained on the
reverse side of their "acknowledgment of order" be-
came part of the contract between it and Air Products
while Air Products contends that its right to rely on the
implied warranty of merchantability (UCC 2–314) fit-
ness for particular purposes (UCC 2–315) and conse-

quential damages (UCC 2–714) has in no way been limited by provision 6, since it never was assented to by it, and, therefore, never became part of the contract. Both parties are in agreement that sec. 2–207, of the Uniform Commercial Code (12A Pennsylvania Statutes Anno. sec. 2–207) is the appropriate standard by which their rights must be determined.

Sec. 2–207 provides:

"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

"(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

"(a) the offer expressly limits acceptance to the terms of the offer;

"(b) they materially alter it; or

"(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

"(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act."

That the parties' initial conclusion that sec. 2–207 is peculiarly applicable to the facts of their dispute is disclosed by the UCC comment 1. It is there stated:

"1. This section is intended to deal with two typical situations. The one is the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon

and adding terms not discussed. The other situation is offer and acceptance, in which a wire or letter expressed and intended as an acceptance or the closing of an agreement adds further minor suggestions or proposals such as 'ship by Tuesday,' 'rush,' 'ship draft against bill of lading inspection allowed,' or the like. A frequent example of the second situation is the exchange of printed purchase order and acceptance (sometimes called 'acknowledgment') forms. Because the forms are oriented to the thinking of the respective drafting parties, the terms contained in them often do not correspond. Often the seller's form contains terms different from or additional to those set forth in the buyer's form. Nevertheless, the parties proceed with the transaction."

In reaching its conclusion that the demurrers of Air Products and Hartford to this affirmative defense should be overruled, the trial court summarized its reasoning as follows:

"It is therefore my conclusion that since these parties were merchants when they dealt with each other in the formation of this contract and since a contract actually came into existence by seasonable acceptance, that acceptance taking place by both the execution of the purchase order and the execution and delivery of the acknowledgment of order, simultaneous acts, and since the original offer to purchase contained no terms or provisions pertaining to the limitation of damages as pleaded in the eighth affirmative defense, that therefore these were completely new and additional proposed terms and, as between merchants, became binding as between the parties and, therefore, if proven, they could constitute a defense to some of plaintiff's claims."

In reaching the above conclusion, apparently the trial court did not consider sub. (2) (b) of sec. 2–207.

One commentator has aptly stated the threshold questions involved in sub. (1):

"The second situation covered by this clause concerns confirmatory memoranda which follow an agreement. 'Confirmation' connotes that the parties reached an agreement before exchange of the forms in question. The

purpose of Code drafters here must have been to make clear that confirmations need not mirror each other in order to find a contract. Simply stated then, under this first clause of section 2–207 (1), it is reasonable to assume that the parties have a deal, then there is a contract even though terms of the writings exchanged do not match.

"All of the language following the comma in subsection (1) simply preserves for the offeree his right to make a counter-offer if he does so expressly. This phrase cannot possibly effect the deal between parties that have reached an agreement and then exchanged confirmations. In that situation it is too late for a counter-offer and subsection (2) must be applied to determine what becomes of the non-matching terms of the confirmations. Thus, under subsection (1), there are two instances in which a contract may not have been formed. First, if the offeror could not reasonably treat the response of the offeree as an acceptance there is no contract. Second, if the offeree's acceptance is made expressly conditional on the offeror's assent to variant provisions, the offeree has made a counter-offer. However, under section 2–207 (3) either situation may result in contract formation by subsequent conduct of the parties." [1]

Because the reverse side of Fairbanks' acknowledgment of order states that the provisions contained there ". . . form part of the order acknowledged and accepted on the face hereof . . ." it would seem that Air Products could have "reasonably" assumed that the parties "had a deal."

Since there is no express provision in the purchase orders making assent to different or additional terms conditioned upon Air Products' assent to them, the second requirement of coming under UCC 2–207 is also met.

Once having satisfied the requirements of sub. (1), any additional matter must fall in sub. (2).

---

[1] *Section 2–207 of the Uniform Commercial Code—New Rules for the "Battle of the Forms,"* 32 Univ. of Pitt. L. Rev. (1971), 209, 210.

The major impact of sec. 2–207 is that it altered the common-law rule which precluded an acceptance from creating a contract if it in any way varied any term of the offer. Sub. (1) expressly provides that there may be a legally binding contract even if the acceptance contains terms "different from" or "additional to" the terms of the offer.

At this point a contract does in fact exist between the parties under (1). Sub. (2) must now be resorted to to see which of the "variant" terms will actually become part of the contract.

At this juncture, Air Products and Hartford argue that 2–207 (2) only applies to "additional terms" while Fairbanks' limitation of liability provisions were "different." To this extent they contend terms are "additional" if they concern a subject matter that is not covered in the offer and "different" if the subject matter, although covered in the offer, was covered in a variant way. Hartford and Air Products' argument seems to expressly contradict Official UCC comment 3 which unequivocably starts "Whether or not *additional or different* terms will become part of the agreement depends upon the provisions of subsection (2)." (Emphasis added.) One commentator has noted that:

"On its face, subsection (2) seems only to apply to *additional* and not conflicting terms, and at least one court has interpreted the language this way. However, this is an unnecessarily limited construction and, as comment 3 to the section points out, subsection (2) should apply to both additional and *different* provisions." 32 Univ. Pitt. L. Rev., *supra*, 211.

The case referred to is *American Parts v. Arbitration Asso.* (1967), 8 Mich. App. 156, 167, 154 N. W. 2d 5, where in explicitly limiting the application of (2) to additional terms the court said of the policy behind 2–207:

"The policy of section 2–207 is that the parties should be able to enforce their agreement, whatever it is, despite discrepancies between the oral agreement and the confirmation (or between an offer and acceptance) *if enforcement can be granted without requiring either party to be bound to a material term to which he has not agreed.*" (Emphasis added.) 154 N. W. 2d at page 12.

The implication seems clear. A party cannot be expected to have assented to a "different" term.

The thrust of the "additional-different" dichotomy as averred for by Air Products and Hartford is that their offer as effectuated by a purchase order includes not only those terms which are expressly stated therein, but also those which are implied by law (*e.g.*, warranty and damage) that will become a part of the contract formed by the sellers acceptance of the offer. Therefore, Fairbanks' limitation of liability terms are different since they are at variance with the implied warranty and damage terms in Air Products' offer. Fairbanks contends that because sec. 2–714 (3) provides that "in a proper case" consequential damages may be recovered by an injured buyer they are clearly not implied in all contracts. Comment 4 to sec. 2–714 refers to the comment for sec. 2–715. It is there stated in comment 3 to sec. 2–715 that:

"In the *absence of excuse under the section on merchant's excuse by failure of presupposed conditions,* the seller is liable for consequential damages in all cases where he had reason to know of the buyer's general or particular requirements at the time of contracting." (Emphasis added.)

We think Fairbanks was aware of the particular needs of Air Products. A reading of secs. 2–714 and 2–715 indicates that a potential recovery for consequential loss is implicit in the contract.

Air Products and Hartford next contend that if the added terms of the "acknowledgment of order" were "ad-

ditional" terms they still do not become part of the contract because the prerequisites to their becoming a part of the contract which are contained in sub. (2) were not satisfied. Sec. 2–207 (2) required that:

"The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
"(a) The offer expressly limits acceptance to the terms of the offer;
"(b) They materially alter it; or
"(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received."

The language employed by Air Products in its "terms and conditions" was not express enough to bring into play the provisions of either sub. (2) (a) or (c) of 2–207. The ultimate question to be determined, therefore, is whether the disclaimer contained in Fairbanks' "acknowledgment of order" materially altered the agreement between the parties pursuant to sec. 2–207 (b). If they materially alter what would otherwise be firmed ‘ by the acceptance of an offer, they will not become terms unless the buyer expressly agrees thereto. ". . . If, however, they are terms which would not so change the bargain they will be incorporated unless notice of objection to them has already been given or is given within a reasonable time." Comment 3 to sec. 2–207.

Hartford and Air Products contend that the eradication of a multimillion dollar damage exposure is per se material. Fairbanks bases its argument on the ground that consequential damages may not be recovered except in "special circumstances" or in a "proper case." (2–714 (2) and (3)). As already stated, these "special circumstances" would seem by comment 3 to sec. 2–715 to be referring to situations which concern instances where the seller did not have reason to know of buyer's general or particular requirements at the time of contracting.

"Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; . . ." UCC sec. 2-715 (2) (a).

While the comment 4 clearly indicates that a disclaimer of an implied warranty of merchantability is material, there is no good reason to hold that a disclaimer that has the effect of eliminating millions of dollars in damages should become a part of a contract by operation of law.

We conclude that the disclaimer for consequential loss was sufficiently material to require express conversation between the parties over its inclusion or exclusion in the contract. It follows that the order overruling the demurrers of Air Products and Hartford must be reversed.

*Question of strict liability.*

Air Products and Hartford have also appealed from the orders sustaining Fairbanks' demurrers to certain of their causes of action and causes of action as amended which sound in strict liability. Air Products fourth cause of action as originally pleaded is representative of the others demurred to as well and reads as follows:

*"Fourth Cause of Action.*

"21. Realleges and incorporates as though fully set forth herein the averments of paragraphs one, two, three, four and seven.

"[1. Name of plaintiff and residence]

"[2. Name of defendant, residence and business]

"[3. The contract for an 11,000 horsepower motor and its specifications]

"[4. That defendant manufactured said motor and shipped it to plaintiff]

"[7. That it was defective]

"22. Defendant was aware when it entered into said contract with plaintiff that said motor would come into plaintiff's possession without there being any substantial change in its condition after it was shipped to plaintiff by defendant. There was no substantial change in the condition of said motor from the time when it was shipped by defendant and received by plaintiff.

"23. Subsequent to its installation plaintiff attempted to operate said motor so it would deliver 11,000 horsepower, and drive said compressor, but said motor did not operate properly because of the defects specified in paragraph 7.

"24. Because of the defects specified in paragraph 7, said motor was not reasonably fit for the ordinary purposes for which such motors are sold and used, to-wit: to operate effectively at 11,000 horsepower, without breaking down, for a reasonable period of time.

"25. As a result of defendant furnishing plaintiff with said motor with said defects in it, plaintiff has sustained damages for repairs, alterations and lost profits in the amount of Thirty One Thousand ($31,000) Dollars."

After the initial demurrer was sustained, Air Products amended paragraph 24 to read as follows:

"24a. The motor because of the aforesaid defects in the fan blades was unreasonably dangerous to certain property of Plaintiff, to-wit: components of said motor other than the portion of the motor containing and/or embodying the defect."

In sustaining the demurrers to the amended complaints, the trial court reasoned that before a cause of action for strict liability could be started under either Pennsylvania or Wisconsin law, it must be alleged that the defective product actually caused *physical harm* to property of the plaintiff, and that the property harmed must be property *other than itself;* to put it another way, the complaint must set forth damages for something other than pure economic loss.

Although this court has very recently extended the strict liability doctrine of *Dippel v. Sciano* (1967), 37 Wis. 2d 443, 155 N. W. 2d 55, to injured bystanders, *Howes v. Hansen* (1972), 56 Wis. 2d 247, 201 N. W. 2d

825, the parties seek only that this court apply Pennsylvania law in determining the outcome of this question and, therefore, it would seem that any further extensions of the doctrine in Wisconsin will have to await consideration until another day.

The parties have extensively briefed the question of whether the doctrine of strict liability should apply to pure "economic loss" and they have cited this court to a host of authorities and to cases of other jurisdictions [2] both favoring [3] and disfavoring [4] its application. Since the adoption of sec. 402A of Restatement, 2 *Torts* 2d, pp. 347, 348 [5] by the Supreme Court of Pennsylvania in

---

[2] *E.g., Note, Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages—Tort or Contract?* 114 Univ. Pa. L. Rev. (1966), 539, Prosser, *The Fall of the Citadel—Strict Liability to the Consumer,* 50 Minn. L. Rev. (1966), 791, Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum. L. Rev. (1966), 917.

[3] *Arrow Transportation Co. v. Fruehauf Corp.* (D. C. Ore. 1968), 289 Fed. Supp. 170; *Santor v. A & M. Karagheusian, Inc.* (1965), 44 N. J. 52, 207 Atl. 2d 305; *Cova v. Harley Davidson Motor Company* (1970), 26 Mich. App. 602, 182 N. W. 2d 800.

[4] *Seely v. White Motor Co.* (1965), 63 Cal. 2d 9, 45 Cal. Rptr. 17, 403 Pac. 2d 145, *Price v. Gatlin* (1965), 241 Ore. 315, 405 Pac. 2d 502, *Southwest Forest Industries, Inc. v. Westinghouse Electric Corp.* (9th Cir. 1970), 422 Fed. 2d 1013, certiorari denied, 400 U. S. 902, 91 Sup. Ct. 138, 27 L. Ed. 2d 138.

[5] Sec. 402A, Restatement, 2 *Torts* 2d, pages 347, 348, provides:

"Sec. 402A. **Special Liability of Seller of Product for Physical Harm to User or Consumer.**

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

*Webb v. Zern* (1966), 422 Pa. 424, 220 Atl. 2d 853, that court has never expressly considered their rule of strict liability as it relates to the precise issue now before this court. They have, however, had occasion to make extensive comments on the subject.

In *Kassab v. Central Soya* (1968), 432 Pa. 217, 246 Atl. 2d 848, the court was there confronted with the question of whether to eliminate the privity requirement in assumpsit suits by purchasers against remote manufacturers for breach of implied warranty. The plaintiffs were raisers of breed cattle and in the course of that activity, purchased quantities of cattle feed which had been manufactured by the defendant. The purchased feed contained "stilbestrol" although the packaging did not so state, and although plaintiffs gave the feed to their animals ". . . the herd began to abort and the breed bull began behaving in a manner which tended to cast doubt upon his masculinity. He was eventually pronounced sterile." Because of community knowledge of what the herd had eaten, the price that the stock brought was greatly diminished and the plaintiff sued for the diminution in market value.

As one of its justifications for doing away with the privity requirement in implied warranty actions, the court analogized to the doctrine of strict liability under the Restatement. The court at 432 Pa. 217, 229, 246 Atl. 2d 848, 853, 854, stated:

"Therefore, prior to the adoption of section 402a, it could be said that to dispense with privity would be to allow recovery in contract without proof of negligence, while requiring a showing of negligence in order to recover for the same wrong against the same defendant if suit were brought in tort. To permit the result of a lawsuit to depend solely on the caption atop plaintiff's complaint is not now, and has never been, a sound resolution of identical controversies.

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

"However, with Pennsylvania's adoption of Restatement 402a, the same demands of legal symmetry which once supported privity now destroy it. Under the Restatement, if an action be commenced in tort by a purchaser of a defective product against a remote manufacturer, recovery may be had without a showing of negligence, and without a showing of privity, *for any damage inflicted upon the person or property* of the plaintiff as a result of this defective product. . . . Thus, in the present case, for example, appellants' complaint alleging that their property (cattle) was damaged (rendered valueless as breeding stock) by virtue of the physical harm caused when these animals ate appellee-Soya's defective feed would have been sufficient to state a valid cause of action had it been captioned 'Complaint in Trespass.' However, because appellants elected to style their complaint as one in assumpsit for breach of warranty under the code, the requirement of privity would prevent these identical allegations from making out a good cause of action. This dichotomy of result is precisely the same evil which, prior to the Restatement, prevented the abolition of privity. It now compels this abolition." (Emphasis added.)

Fairbanks contends that the proper theory in cases concerning economic loss of the type here involved in a commercial transaction is breach of warranty under the Uniform Commercial Code and not strict liability. To this contention the Pennsylvania court in a very lengthy footnote discussed the similarities between their interpretation of remedies under both the Code and the Restatement, and of their overall concern to make the two co-extensive.

"The language of the Restatement, speaking as it does of injury to either the individual or his property, appears broad enough to cover practically all of the harm that could befall one due to a defective product. Thus, for example, were one to buy a defective gas range which exploded, ruining the buyer's kitchen, injuring him, and of course necessitating a replacement of the stove itself, all of these three elements of the injury should be compensable. The last, replacing the stove, has been some-

times referred to as 'economic loss,' *i.e.*, 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.' Comment, 114 U. Pa. L. Rev. 539, 541 (1966). There would seem to be no reason for excluding this measure of damages in an action brought under the Restatement, since the defective product itself is as much 'property' as any other possession of the plaintiff that is damaged as a result of the manufacturing flaw. Thus, since the tort action would enable plaintiff to recover for economic loss (the physical harm necessitated by 402a would, ipso facto, be present given the defect in the product which caused the damage), so also should this form of damages be compensable in contract. Contract cases from other jurisdictions dispensing with privity have allowed recovery for all three types of injury: personal injury, *Henningsen v. Bloomfield Motors, Inc.*, *supra* note 3; injury to plaintiff's property other than the defective article itself, *Morrow v. Caloric Appliance Co.*, *supra* note 3; and 'economic loss,' *State Farm Mut. Auto Ins. Co. v. Anderson-Weber, Inc.*, *supra* note 3." 432 Pa. 217, 231, 246 Atl. 2d 848, 854, 855.

No pronouncement of the Pennsylvania Supreme Court can be found which would in any way detract from this broad policy statement.

Given the fact that this very broad language concerning the scope of damages which would be covered under sec. 402A of the Restatement in Pennsylvania was "volunteered" by the court and also given the fact that it was made after the decisions of other jurisdictions in which strict liability was made inapplicable to pure "economic loss" indicating that it was made in spite of those decisions, we think the amended complaints containing allegations that the machines were unreasonably dangerous to other parts of themselves have set forth a valid cause of action for strict liability under Pennsylvania law. Therefore, the order sustaining Fairbanks' demurrer to the amended complaints must be reversed.

*By the Court.*—The order sustaining plaintiff's demurrers to defendant's affirmative defenses based on the statute of limitations is affirmed. The order overruling plaintiff's demurrers to defendant's affirmative defenses based on the liquidated damages provisions of Air Products purchase orders is affirmed. The order overruling plaintiff's demurrers to defendant's affirmative defenses based on limitations of liability in Fairbanks' acknowledgment of order is reversed. The order sustaining the demurrers to plaintiff's amended complaints alleging a cause of action for strict liability is reversed. No costs to be taxed in this court.