891 F.2d 1251
 116 Lab.Cas. P 56,339
 Gordon W. McMAHON, Plaintiff-Appellant Cross-Appellee,
v.
PENNSYLVANIA LIFE INSURANCE COMPANY, Defendant-Appellee
Cross-Appellant,
and
Stanley Beyer, Kenneth Opstein, Gerald Weiner, Timothy C.
McKinney, Rodney Mitchell and James W. Henry,
Defendants-Appellees.
 Nos. 88-3463, 89-1007.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 13, 1989.
Decided Dec. 12, 1989.
 
 Joseph Owens (argued), Pangman & Associates, Waukesha, Wis., for plaintiff-appellant cross-appellee.
 Michael H. Auen (argued), Gordon Davenport, III (argued), Foley & Lardner, Madison, Wis., for defendants-appellees.
 Before EASTERBROOK and MANION, Circuit Judges, and GRANT, Senior District Judge.*
 MANION, Circuit Judge.
 
 
 1
 Gordon McMahon, a former agent and agency manager for Pennsylvania Life Insurance Company (Penn Life), was fired in 1982. He sued Penn Life in 1988 under several causes of action. Only one count--breach of implied contract--made it to trial. The jury found that Penn Life had good cause to fire McMahon. However, the jury also found that Penn Life violated the implied contractual covenant of good faith and fair dealing, and awarded McMahon $43,923 in damages.
 
 
 2
 McMahon appeals the district court's grant of summary judgment for Penn Life on breach of fiduciary duty and conspiracy to defraud counts, and its refusal to allow presentation of evidence on consequential damages. Penn Life cross-appeals the judgment for McMahon.
 
 
 3
 We affirm the district court's summary judgment and evidentiary rulings for Penn Life and reverse the judgment for McMahon because the cause of action on which the jury hinged liability is barred by the applicable statute of limitations.
 
 I. BACKGROUND
 
 4
 Pennsylvania Life Insurance Company is a corporation selling various kinds of insurance, primarily life and disability. Penn Life promotes itself by emphasizing commitment to employees. Salesmen are recruited and motivated by a marketing theme describing employees as "partners" in the company's growth and success.
 
 
 5
 Penn Life hired McMahon as a salesman (agent) in 1967 to work on a commission basis in Madison, Wisconsin. He progressed through several management positions and became a district manager in Ontario, Canada in 1971. Three years later McMahon became a "participating manager" pursuant to a written contract called an "agency manager's agreement." The contract provided for McMahon to be paid a $500.00 salary per month, while receiving a percentage of any profits.[1] One provision of the employment contract governed termination:This Agreement shall terminate automatically upon the occurrence of any of the following conditions: death, termination of insurance license, total disability of the Agency Manager, the termination of the right of the Company to do business in the Province of Ontario, Dominion of Canada. Otherwise, termination of this Agreement shall be effected by means of registered mail-return receipt requested, to the last known address of the party to this Agreement.
 
 
 6
 Trial testimony revealed that sales by McMahon's Ontario office declined substantially in the years prior to his termination. Sales of new policies fell from more than $700,000 in 1976 to less than $200,000 in 1981, while the sales force diminished from 26 agents in 1977 to 10 in 1981. McMahon's superiors at Penn Life testified that McMahon became increasingly uncooperative and unwilling to follow their directions or heed their warnings.
 
 
 7
 McMahon received written notice of termination, effective February 4, 1982. McMahon contractually was entitled to post-termination commissions from renewal premiums. He has received and continues to receive these renewal premiums. Because McMahon's commissions were not subject to overhead costs and expenses post-termination, his income actually increased in the years following his dismissal. In 1981, his last full year of work, McMahon earned approximately $40,000 from profit participation. After termination, his profit participation--based on renewals without deductions for office and other expenses--increased to $69,000 in 1982, then gradually declined to $58,000 in 1983, $53,000 in 1984, $47,000 in 1985 and $41,000 in 1986. McMahon continues to receive renewal profits.
 
 
 8
 McMahon sued Penn Life and six individual defendants on six counts: 1) breach of express contract; 2) breach of implied contract; 3) promissory estoppel; 4) breach of fiduciary duty; 5) conspiracy to defraud; and 6) civil RICO. McMahon agreed to dismiss all the individual defendants as lacking the required minimum contacts with the state of Wisconsin. He further agreed to dismiss the sixth cause of action (civil RICO) as untimely following the Supreme Court's decision regarding civil RICO statutes of limitations in Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (four-year statute of limitations applicable to Clayton Act civil enforcement actions applies in RICO civil enforcement action). The district court dismissed the fourth cause of action (breach of fiduciary duty) due to expiration of Wisconsin's two-year statute of limitations.
 
 
 9
 The district court granted summary judgment for Penn Life on the first (breach of express contract), third (promissory estoppel), and fifth (conspiracy to defraud) causes of action. McMahon does not appeal dismissal of the first and third counts.
 
 
 10
 The case proceeded to trial on the sole remaining count, breach of implied contract. The district court concluded that this count presented two claims under California law:[2] 1) breach of an implied agreement to terminate only for cause; and 2) breach of the implied covenant of good faith and fair dealing. The jury found first that, although there was an implied agreement to terminate only for good cause, Penn Life had good cause to terminate McMahon. However, the jury also found that Penn Life violated the implied covenant of good faith and fair dealing, and awarded $43,923 in damages. The district court did not allow the jury to consider potential consequential damages.
 
 II. McMAHON'S APPEAL
 A. Partnership
 
 11
 McMahon argues that the "core issue on appeal is whether the contractual relationship constituted a partnership business venture, or whether it was purely one of employee-employer." McMahon claims a partnership existed between McMahon and Penn Life that created obligations for Penn Life above and beyond the terms of the employment contract. Thus McMahon appeals the district court's dismissal of the breach of fiduciary duty count and grant of summary judgment for Penn Life on the conspiracy to defraud count, alleging that the district court wrongly failed to consider these claims under the law of partnership.
 
 
 12
 The district court rejected the partnership argument, holding that even if a partnership claim were properly alleged in the pleadings,[3] and even if a partnership existed, McMahon's recovery would be no greater than under a breach of employment contract theory. We agree with the district court that the existence of a partnership could not possibly lead to a greater recovery for McMahon, because recovery is limited by the terms of the agency manager's agreement.
 
 
 13
 McMahon sought without success to have the district court look at his relationship with Penn Life as a partnership, "rather than as one between an employee and his employer."[4] He assumes that by casting the relationship in that light, he will be entitled to a portion of the "going concern" and the future profits of Penn Life's Ontario office. But partnerships are bound, just like terms of employment, by the written contracts that give them birth. 59A Am.Jur.2d §§ 1, 96. Mursor Builders v. Crown Mountain Apt. Assoc., 467 F.Supp. 1316, 1332 (D.V.I.1978), Adams v. United States, 328 F.Supp. 228, 230 (D.Neb.1971). And the agency manager's agreement in this case does not provide for McMahon to recover anything other than what he has received and continues to receive--a share of the renewal premiums on policies written during his tenure as agency manager.
 
 
 14
 The relevant portions of the agency manager's agreement provide:
 
 
 15
 The Agency Manager's proportional share of the Agency profits shall be vested in him even if he is permanently and totally disabled, or after his death in his heirs and assigns, so long as the Agency Manager remains in compliance with [various terms and conditions of the agreement]....
 
 
 16
 It is understood that all of the insurance business transacted in the territory shall be considered business of the Company ...
 
 
 17
 The "Agency Manager's proportional share of the Agency profits" was determined according to a "Profit Distribution Formula" (emphasis added):
 
 
 18
 (1) For the purpose only of determining the distribution of profits payable to the Agency Manager under the contract of which this is a part, the following formula shall apply:(a) There shall be allocated to the agency certain commissions, first year and renewal, from the gross premiums actually received by the Company on business produced by the agency
 
 
 19
 ....
 
 
 20
 (b) There shall be deducted from all such commissions allocated to the agency the following:
 
 
 21
 (1) All salaries, commissions, overwriting fees, service fees and the like, first year and renewal, payable [to all employees]....
 
 
 22
 (2) All expenses and overhead of the agency....
 
 
 23
 (c) After all of the aforesaid computations have been made, the Agency Manager shall receive thirty percent (30%) of the resulting profits....
 
 
 24
 The contract is quite specific in describing the compensation to which McMahon is entitled. This incentive-based, profit-sharing agreement makes clear that McMahon receives, and has vested in him after termination, only the "Agency Manager's proportional share" of profits. The "Profit Distribution Formula" indisputably was the formula used to determine McMahon's share of the agency profits, and therefore also governs his share of renewal profits from policies sold during his tenure as manager.
 
 
 25
 Therefore, McMahon's rights after termination are the same, no matter whether he is considered a partner or an employee of Penn Life. The district court properly dismissed the breach of fiduciary duty count, and properly granted summary judgment for Penn Life on the conspiracy to defraud count.[5]
 
 B. Consequential Damages
 
 26
 McMahon challenges the district court's ruling that he was not entitled to present to the jury evidence of alleged consequential damages. In particular, McMahon alleges that he should have been allowed to show the jury evidence of liquidation of assets after termination--the "forced" sale of his Ontario home and of certain investment real estate, along with the sale of stock in Penn Life's parent corporation. McMahon apparently seeks to recover the difference between the value of the assets at the time of the sale and their value at the time of trial. This novel theory presents at least two problems: 1) there is no evidence McMahon was forced to liquidate his assets by termination of his employment contract, especially given that his income rose in the years following his termination; and 2) he provides no authority and we find none for awarding damages based on increased value of assets after breach, when full value was received for the assets when they were liquidated.
 
 
 27
 However, we need not reach the merits of this issue. Damages do not occur without a breach of contract. Because we hold, infra, that the cause of action under which the jury found Penn Life liable--breach of the covenant of good faith and fair dealing--is barred by California's statute of limitations, we are left with only the jury's finding that McMahon was terminated for cause. Consequently there is no breach of contract, and therefore no damages.
 
 III. PENN LIFE'S CROSS-APPEAL
 
 28
 The district court presented the jury with two theories by which Penn Life could be found liable for breach of implied contract. The completed jury verdict form read:
 
 
 29
 1. Did an implied agreement exist between the parties that plaintiff would be terminated by defendant only for good cause?
 
 Answer: Yes
 
 30
 If you answered "yes" to question 1, proceed to question 2. Otherwise proceed to question 3.
 
 
 31
 2. Was plaintiff terminated by the defendant without good cause?Answer: No.
 
 
 32
 3. Did the defendant breach its covenant of good faith and fair dealing in its termination of the plaintiff?
 
 
 33
 Answer: Yes.
 
 
 34
 Thus the two alternate theories of liability were: 1) breach of an implied agreement to terminate only for cause; and 2) breach of the covenant of good faith and fair dealing. The jury found Penn Life liable on only the second theory. Penn Life argues that the second theory is unavailable due to the jury's rejection of the first theory, and because it is barred by California's statute of limitations.
 
 A. "Good Cause" vs. At-Will
 
 35
 Penn Life contends that, as a matter of law, the breach of the covenant of good faith and fair dealing is barred because the jury's response to the first two questions shows Penn Life did not breach the employment contract. Penn Life argues that without breach of an implied contract there can be no breach of the covenant of good faith. This argument is conditioned on Penn Life's assumption that McMahon is an at-will employee.
 
 
 36
 California law governs the contract's substantive components. The leading California Supreme Court case involving the implied covenant of good faith and fair dealing in an employment termination case is Foley v. Interactive Data Corp., 765 P.2d 373 (Cal.1988). Foley involved a claim for tortious breach of the implied covenant of good faith and fair dealing. 765 P.2d at 389. The California Supreme Court held that the implied covenant applied only to contract-based causes of action, and refused to authorize recoveries in tort for breach of the covenant. Id. at 401.
 
 
 37
 Penn Life is correct in reading Foley to hold that in an at-will employment relationship, a claim for breach of the covenant cannot be based on the employer's failure to show good cause for termination. That is because "in an at-will relationship there is no agreement to terminate only for good cause," and "the implied covenant standing alone cannot be read to impose such a duty." Foley, 765 P.2d at 400, n. 39.
 
 
 38
 But here we do not have an at-will relationship, nor do we have an implied covenant "standing alone." The jury settled the at-will issue by responding affirmatively to the first question: "Did an implied agreement exist between the parties that plaintiff would be terminated ... only for good cause?" By responding yes, the jury tells us that McMahon and Penn Life were not in an at-will employment relationship, and thus, under California law, a separate cause of action for breach of the covenant can be maintained. The fact that Penn Life did have good cause to terminate McMahon does not change the nature of their employment relationship.
 
 
 39
 Penn Life also argues that the employment contract was terminable at-will as a matter of law, and both liability theories therefore should never have reached the jury. The argument goes like this: because the termination provision makes no mention of the contract's length, California's statutory presumption in favor of at-will employment contracts applies.[6] According to Penn Life, the parol evidence rule then bars extrinsic evidence of an implied agreement to terminate only for cause.
 
 
 40
 In rejecting Penn Life's motion for summary judgment, the district court correctly noted that no language in the agreement indicated that it was intended to be an integrated document. The court further found that the contract's language is not so clear as to preclude the possibility that it could have been modified later. The court relied on Hillsman v. Sutter Community Hospitals of Sacramento, 153 Cal.App.3d 743, at 755, 200 Cal.Rptr. 605 (1984), in which the California Court of Appeal held that because contract language very similar to that at issue here was not sufficiently clear, consideration of extrinsic evidence was appropriate. See also Brawthen v. H & R Block, Inc., 52 Cal.App.3d 139, 124 Cal.Rptr. 845 (1975) (employer's oral representations of "permanent" employment admissible to vary a terminable written contract). The district court correctly concluded that the contractual language did not foreclose the possibility McMahon could prove an implied agreement requiring good cause for termination. The issue of whether there was a breach of good faith and fair dealing went to the jury, which found that sufficient evidence of an implied agreement overrode the statutory presumption in favor of at-will employment contracts. But because this claim is unique to California law, the statute of limitations remains in question.
 
 B. Statute of Limitations
 
 41
 McMahon filed this lawsuit on January 28, 1988, just a few days before the six-year anniversary of his termination date of February 4, 1982. Ontario and Wisconsin limitation statutes for breach of contract cases are six years. RSO Ch. 240 ("Limitations Act") 345(a)(g); Wis.Stat. § 893.43. California's relevant statutes of limitations are four years for actions on written contracts, and two years for actions on oral contracts. Cal.Code Civ.Proc. § 339(1); Cal.Code Civ.Proc. § 337(1).[7] Applying Wisconsin's "borrowing statute," the district court concluded that Ontario's six-year statute of limitations governed the cause of action, and dismissed Penn Life's motion for summary judgment.
 
 
 42
 The law of the forum state--Wisconsin--controls the choice of which statute of limitations applies. See Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1943); Beard v. J.I. Case Co., 823 F.2d 1095, 1099 (7th Cir.1987). Wisconsin's "borrowing statute" is intended to resolve conflicts between jurisdictions on statute of limitations questions. Wis.Stat. § 893.07 provides:
 
 
 43
 (1) If an action is brought in this state on a foreign cause of action and the foreign period of limitation which applies has expired, no action may be maintained in this state.
 
 
 44
 (2) If an action is brought in this state on a foreign cause of action and the foreign period of limitation which applies to that action has not expired, but the applicable Wisconsin period of limitation has expired, no action may be maintained in this state.
 
 
 45
 We first must determine what constitutes a foreign cause of action under this statute. The Wisconsin Supreme Court and this court recently have interpreted the phrase in the context of personal injury tort cases. Both determined that the place the injury occurred was decisive. See Guertin v. Harbour Assurance Co. of Bermuda, Ltd., 141 Wis.2d 622, 415 N.W.2d 831 (1987); Johnson v. Deltadynamics, Inc., 813 F.2d 944 (7th Cir.1987).
 
 
 46
 In Johnson, we pointed out that a different question was presented, and perhaps a different analysis required, when a case involved a contract rather than a tort:
 
 
 47
 Now suppose that, contrary to what we have just said, "foreign cause of action" refers to something more complex than the place of the tort; this may in fact be true in the case of a dispute over a contract, whose "location" is not easily pinned to a particular state if, for example, as is common, the contract is negotiated in one state, signed in another, and performed in a third.
 
 
 48
 Johnson, 813 F.2d at 946. Here we are confronted with exactly the issue we hypothesized in Johnson. We have a Wisconsin plaintiff, a California defendant, a contract requiring that California's substantive law apply, a California cause of action, and an Ontario location for performance. In short, we have a "dispute over a contract, whose location is not easily pinned to a particular state ..." Johnson, id.
 
 
 49
 No Wisconsin court has addressed this particular question. The district court, when examining how Wisconsin courts would resolve this question under the borrowing statute,[8] correctly rejected using Wisconsin's "center of gravity" choice of law approach to determine which state's statute of limitations applied:
 
 
 50
 The Guertin court made it plain that certainty and predictability were primary motivations in the drafting of § 893.07. The subjective nature of a determination under the "center of gravity" test ... is clearly contrary to that goal. Not only would such application directly contradict the Wisconsin Supreme Court's directives and render the statute meaningless as to contract claims, it would conflict with the legislative goal of predictability of result in the area of statutes of limitations.
 
 
 51
 Memorandum and Order of May 25, 1988 at 6.
 
 
 52
 As this court put it in Johnson,
 
 
 53
 [t]he statute would add little or nothing to the common law of Wisconsin if by the use of the expression "foreign cause of action" the legislators meant to require the courts to go through their usual conflict of laws analysis in deciding whether the foreign period of limitations is a bar.
 
 
 54
 813 F.2d at 946. As the Guertin court pointed out, such a conflict of laws analysis
 
 
 55
 ... confuses two separate conflicts issues. One type of conflicts assessment is the selection of law to resolve substantive issues of an action that is timely before a Wisconsin court.... The present action illustrates an initial conflict of law determination as to the timeliness of the action....
 
 
 56
 * * *
 
 
 57
 * * *
 
 
 58
 Wisconsin's borrowing statute uses the place of injury only to determine which jurisdictions are to be compared in establishing the shorter limitation period.
 
 
 59
 * * *
 
 
 60
 * * *
 
 
 61
 To apply choice-influencing considerations to the issue of timeliness of an action resolved by § 893.07, Stats., as it is currently drafted, however, would defeat the express provisions and policies served by this statute.
 
 
 62
 Guertin, 415 N.W.2d at 834-35.
 
 
 63
 Unfortunately, the district court's solution suffers from the same defect. Citing an earlier passage from Guertin where the Wisconsin Supreme Court suggested possible alternative meanings of the phrase "foreign cause of action," the district court concluded that "significant contacts with another jurisdiction" was the "appropriate approach." The district court concluded that the contract's most "significant contacts" were with Ontario, and thus applied Ontario's six-year statute of limitations.
 
 
 64
 This approach misreads Guertin in several fundamental ways. First, "significant contacts" is merely another choice of law test. As Guertin makes clear, the borrowing statute was written to avoid having to use such tests. In addition, the "significant contacts" test now has been rejected by Wisconsin courts. Second, the Guertin court goes on to conclude that a "foreign cause of action" does not mean "significant contacts," but rather means an action "where injury arises outside the forum state." Third, Guertin was clearly seeking an explanation of the phrase's meaning in a personal injury/tort context. We know from Johnson and Guertin that a contracts case presents a different question.
 
 
 65
 In Guertin, the Wisconsin Supreme Court set forth its understanding of the Wisconsin legislature's basis for enacting § 893.07:
 
 
 66
 The manifest intent of the legislature in enacting this borrowing statute was to adopt the shortest possible limitation period for actions litigated in this state potentially subject to more than one statute of limitations. The policies advanced by such a statute include the reduction of forum shopping, the prevention of stale claims, the expedient litigation of controverted matters, and the avoidance of uncertainty in assessing the timeliness of bringing an action in this state without the necessity of a court hearing to make such a determination, thereby preserving scarce judicial resources.
 
 
 67
 Guertin, 415 N.W.2d at 835.
 
 
 68
 Applying these factors, particularly the overriding legislative concern with forum shopping and protecting defendants from stale claims,[9] we believe it is logical to apply the statute of limitations of the only state with an interest in protecting defendants from stale claims under the cause of action relied on in this case--California. California is the only jurisdiction involved here that recognizes the covenant of good faith and fair dealing as a separate theory of liability in employment contract cases. See Foley v. Interactive Data Corp., 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988); Gianaculas v. Trans World Airlines, Inc., 761 F.2d 1391, 1394 (9th Cir.1985).[10]
 
 
 69
 "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement...." Restatement (Second) of Contracts § 205, quoted in Foley, 765 P.2d at 389. While it is true such a duty exists generally in Wisconsin,[11] it does not necessarily create liability for its breach through a separate cause of action in employment termination cases. It was created in contract law as " 'a kind of safety valve' to which judges may turn to fill gaps and qualify or limit rights and duties otherwise arising under rules of law and specific contract language." Foley, 765 P.2d at 389. But as with most judicial doctrines discovered in California, this one has taken on a life of its own; it expanded into the employment termination context in a series of cases starting with Pugh v. See's Candies, Inc., 116 Cal.App.3d 311, 171 Cal.Rptr. 917 (1981). Wisconsin has no such line of cases. Indeed, Wisconsin specifically has rejected such a theory, a fact noted by the California Supreme Court in Foley. 765 P.2d at 378. In Brockmeyer v. Dun & Bradstreet, 113 Wis.2d 561, 335 N.W.2d 834 (1983), the Wisconsin Supreme Court discussed cases from New Hampshire and Massachusetts that "impose[d] upon an employer an implied duty to terminate an employee only in good faith."
 
 
 70
 Both courts held that the employment contract contained an implied covenant of good faith and fair dealing and that a discharge made in bad faith constituted a breach.
 
 
 71
 We refuse to impose a duty to terminate in good faith into employment contracts. To do so would 'subject each discharge to judicial incursions into the amorphous concept of bad faith.' [Citations omitted.] Moreover, we feel it is unnecessary and unwarranted for the courts to become arbiters of any termination that may have a tinge of bad faith attached. Imposing a good faith duty to terminate would unduly restrict an employer's discretion in managing the work force.
 
 
 72
 335 N.W.2d at 838.
 
 
 73
 Thus, unlike Guertin and Johnson, we are not faced with a cause of action that is available in both jurisdictions. The cause of action for breach of the covenant of good faith and fair dealing in an employment termination, being available only in California, is truly a "foreign cause of action" under the Wisconsin borrowing statute.[12] Therefore we apply § 893.07 to decide whether the statute of limitations of Wisconsin or California applies. Section 893.07(1) requires that we first determine whether California's limitations period has run. Because California's statutes of limitations for breach of oral contracts (two years) and written contracts (four years) have expired, the claim is barred under § 893.07.
 
 
 74
 Accordingly, we affirm the district court's grant of summary judgment for Penn Life on breach of fiduciary duty and conspiracy to defraud counts, and reverse the judgment for McMahon on breach of implied contract because the claim is barred by the applicable statute of limitations.
 
 
 
 *
 Senior District Court Judge Robert A. Grant, U.S. District Court for the Northern District of Indiana, is sitting by designation
 
 
 [1]
 McMahon contends the agreement also required him to share in any losses compiled by the Ontario office. There is no evidence to that effect in the record. The contract provides for the agency manager to receive a salary and a percentage of the agency's profits, minus overhead and expenses of maintaining the office. There is no provision in the contract for sharing losses in the event costs exceed revenue. Uncontroverted testimony at trial indicated that Penn Life's policy was to offset losses against future revenue. If the office never generated sufficient profits to offset accrued losses, the losses would be forgiven as to the agency manager
 
 
 [2]
 The contract provides, and the parties do not dispute, that California law governs the contract's substantive components
 
 
 [3]
 The district court seems to have based its ruling, at least in part, on the conclusion that no partnership claim was properly alleged in the pleadings. However, the district court went on to reject McMahon's partnership theory on the merits. Because it is unclear to what extent the district court's partnership ruling was based on the sufficiency of the pleadings, and because the district court discussed the merits, we will assume McMahon stated a partnership cause of action
 
 
 [4]
 The district court, in addition to questioning whether the partnership issue was properly raised by the pleadings, and in addition to holding that a partnership would entitle McMahon to no greater recovery than an employment contract, seemed to doubt that the relationship was actually a partnership. The court was particularly troubled by McMahon's attempt to recover under both employer-employee and partnership theories, and cited this passage from 59A Am.Jur.2d Partnership § 13:
 There are similarities between partnership and employment, but partnership is inconsistent with the relationship of master and servant or employer and employee. If the relationship of master and servant exists between persons, it necessarily precludes a partnership relation, and vice versa.
 Although it is certainly true a partner may become an employee of a partnership in order to perform certain specified tasks, this passage seems to indicate that one may not be considered both for doing the same job.
 Furthermore, it appears from trial testimony McMahon was not responsible to Penn Life for any losses sustained by the Ontario office. Sharing of losses, as well as profits, is generally considered an important element in creating a partnership, and the contract did not explicitly provide for sharing of losses. See Uniform Partnership Act § 15.
 In any event, even if we were to assume a partnership existed, that fact would not be relevant to our determination of any damages for breach of the employment agreement.
 
 
 [5]
 Even if it mattered that McMahon and Penn Life were partners, McMahon's breach of fiduciary duty claim was properly ruled barred by Wisconsin's two-year statute of limitations (see Warmka v. Hartland Cicero Mutual Ins. Co., 136 Wis.2d 31, 400 N.W.2d 923 (1987)) and his conspiracy to defraud count was properly rejected because, as a matter of law, Penn Life could not have conspired with itself (see Wise v. Southern Pacific Company, 223 Cal.App.2d 50, 35 Cal.Rptr. 652 (1963)) (corporation cannot conspire with employees acting on its behalf)
 
 
 [6]
 "An employment, having no specified term, may be terminated at the will of either party on notice to the other." Cal.Labor Code § 2922
 
 
 [7]
 Because the district court did not use California's statute of limitations, it did not decide whether an implied contract based on matters extraneous to the written document would be considered a written or oral agreement. We need not decide this issue because McMahon's claim is barred under either California statute of limitations
 
 
 [8]
 See, e.g., Beard v. J.I. Case Co., 823 F.2d at 1100 (emphasis added). ("We conclude that, if faced with this question, the Wisconsin Supreme Court would construe its borrowing statute not to require the use of a foreign period of repose.")
 
 
 [9]
 See Air Products & Chem., Inc. v. Fairbanks Morse, Inc., 58 Wis.2d 193, 206 N.W.2d 414, 419 (1973)
 
 
 [10]
 See also Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harvard L. Rev. 369 (1980); The General Duty of Good Faith--It's Recognition and Conceptualization, 67 Cornell L. Rev. 810 (1982); "Contort": Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing in Noninsurance, Commercial Contracts--Its Existence and Desirability, 60 Notre Dame L. Rev. 510 (1985)
 
 
 [11]
 See In re Estate of Chayka, 47 Wis.2d 102, 176 N.W.2d 561, 564 (1970)
 
 
 [12]
 Office Supply Co., Inc. v. Basic/Four Corp., 538 F.Supp. 776 (E.D.Wis.1982), is not opposed. Similar to here, Office Supply involved the question whether to apply the Wisconsin borrowing statute in a contracts case where California substantive law applied. The court declined to consider the claim as a foreign cause of action and apply the borrowing statute, which would have barred the claim. Instead, the court used Wisconsin's statute of limitations and allowed the claim to proceed. However, the cause of action existed in both California and Wisconsin, unlike here. The most significant contacts were with Wisconsin, unlike here. And, importantly, the court relied heavily on Wisconsin's interest in seeing its own statute of limitations applied to a cause of action arising in Wisconsin. Wisconsin has no such interest here, and this factor actually works in favor of applying California's statute of limitations. California is the only jurisdiction with an interest in protecting defendants from stale claims under this unique theory of liability. And California has chosen a shorter limitations period