**OFFICE SUPPLY CO., INC., a Wisconsin corporation, Plaintiff,**

v.

**BASIC/FOUR CORPORATION, a foreign corporation, Defendant.**

Civ. A. No. 80–C–603.

United States District Court, E. D. Wisconsin.

May 3, 1982.

John V. Whaley, Whaley & Whaley, John W. Foley, Foley, Foley & Seehawer, Racine, Wis., for plaintiff.

Emily S. Mueller, Thompson & Coates, Ltd., Racine, Wis., for defendant.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This is an action for damages brought pursuant to 28 U.S.C. § 1332. The plaintiff Office Supply Co., Inc. ("Office Supply") is a corporation located in Racine, Wisconsin, which sells office supplies. The defendant Basic/Four Corporation ("Basic/Four") is a California corporation which manufactures and sells computer hardware and software. In 1975, Office Supply purchased computer hardware and leased computer software from Basic/Four. Office Supply claims that the system was defective and caused it to suffer substantial losses. It seeks compensation for "lost customers, income, good will and executive time and incurred additional hardware and software expense, office form expense, personnel expense and maintenance expense, all to its damage in the sum of $186,000 plus reasonable interest since April, 1975." (Complaint, paragraph NINTH.)

Presently pending before the Court are the defendant's motion for summary judgment, the plaintiff's motion for partial summary judgment, and the plaintiff's motion to compel answers to interrogatories and for compliance with a demand for the production of documents. For the following reasons the plaintiff's motions will be denied and the defendant's motion for summary judgment will be granted.

### The Summary Judgment Motions

On January 31, 1975, the plaintiff's president, James F. Bruno, signed a contract for the purchase of computer hardware from the defendant and of computer software which was intended to control order processing, inventory control, sales analysis, and accounts receivable.[1] Mr. Bruno mailed the contract to the defendant, and it was accepted by the defendant's assistant treasurer, R. C. Trost, on February 7, 1975. On April 1, 1975, the hardware was installed. In a letter dated May 22, 1975, the defendant advised the plaintiff that the

warranty on the hardware would expire on July 1, 1975. The input of data on the software programs took longer to complete, and for a period of time the plaintiff ran parallel operations on the computer and manually as a check on the accuracy of the software applications. In a letter dated October 6, 1975, Mr. Bruno advised Basic/Four:

"All of the applications anticipated by our company in agreeing to acquire our BASIC/FOUR System are complete and the system appears to be satisfactory. This fulfills your contractual obligation.

"Although the applications programs appear to be operating satisfactorily, some 'defects' might become apparent [sic] later. (Defects might comprise misinterpretation of data, mishandling of a keyboarding error, or a confusing operator instruction—but would not include anything beyond the scope of the system design specification.) It is my understanding that you warrant your programs, when used in accordance with Basic/Four operating instructions, to be free from 'defects' for a period of ninety days, and that you will correct such 'defects' promptly when they are brought to your attention." (Exhibit E to defendant's memorandum in support of motion for summary judgment, filed December 15, 1981.)

Basic/Four took the position that its warranty on the software expired on January 6, 1976. As to complaints received after that date from Office Supply, it did continue to work with Office Supply in an effort to correct any claimed defects in the computer system. Office Supply also hired Ted Templeton, an independent programmer with a company called Computer Methods, Inc., who was recommended by Basic/Four, to work on its Basic/Four system starting some time after Basic/Four advised that the warranty period was over. The record established that Mr. Templeton made some modifications in the Basic/Four software. He also added at least one new program,

1. The sale of the software was technically in lease form for reasons related to copyright protection. No one has contended that the technical lease arrangement has any significance to application of the UCC.

the ABC program which involved inventory control, to the system. Starting in January 1978, Office Supply also hired a programmer, Marc Jerome, as a fulltime employee. He found what he claims were three major defects in the software system. The record establishes that two of those defects were in programs which Basic/Four did not supply to the plaintiff. The third defect was in the UJ portion of the Basic/Four accounts receivable program, but there is no evidence that the defect arose in the UJ program until after July 1976, which was after the end of the ninety-day period during which Basic/Four continued to warrant its software applications to be free from defects.

The plaintiff's vice president, David Carlson, testified during his deposition that starting at the end of October 1975 and continuing through early 1978, approximately 20% of the customer accounts were out of balance and the Basic/Four system performed up to 78% of expectation for Office Supply (Tr. at 50–51 and 63). Since February 1978, when Marc Jerome finished correcting the defects in the system, Carlson testified that it has performed up to 100% of expectation (Tr. at 46). The plaintiff's president, James Bruno, testified that the system only performed up to 50% of expectation prior to 1978 (Tr. at 114), that the accounts receivable first went out of balance on the October 1975 monthly statement printed during the first week of November 1975 (Tr. at 43), that it printed through for the first time in February 1976 (Tr. at 135), but that thereafter the accounts receivable problem continued on an intermittent basis until it was corrected by Marc Jerome in early 1978 (Tr. at 87, 132–134, 136, and 142). Both men testified that there were also problems with the hardware but that those problems were always corrected by Sorbus, a service corporation related to Basic/Four with which Office Supply had a hardware maintenance contract, with only a very few minimal extra charges not covered by the monthly maintenance charges. (Carlson Tr. at 38; Bruno Tr. at 121.)

On June 17, 1980, Office Supply commenced its action against Basic/Four.

The portion of the Office Supply-Basic/Four contract dealing with the purchase of the hardware is a straightforward document. It describes on the front of the document the computer model and features and the purchase price. Additional terms and conditions of sale are set forth on the reverse. In relevant part it provides on the reverse that it constitutes the entire agreement and understanding between the parties, that it shall be governed by the law of California, and as to warranties and remedies for breach of warranty:

"3. For ninety (90) days after the Equipment is installed * * * the Seller warrants the Equipment to be free from defects in material, workmanship, and operating failure from ordinary use, and the Seller's liability is limited solely to correcting any such defect or failure without charge. * * *"

In italic print paragraph 3 also states:

"The warranties contained in this Agreement are in lieu of all other warranties, express or implied, including any regarding merchantability or fitness for a particular purpose, arising out of or in connection with any Equipment (or the delivery, use or performance thereof). The Seller will not be liable * * * (b) for loss of profits or other incidental or consequential damages * * *."

The portion of the contract dealing with the lease of the software is not as clearly drafted. On its first page, which is page 3 of the contract, it states:

"This Addendum to the Agreement for the Purchase of BASIC/FOUR Equipment, dated as of the 31 day of January 1975, between Basic/Four Corporation and Office Supply Inc. is hereby incorporated therein and made a part thereof."

Page 3 describes the program applications and their price. Additional terms and conditions are set forth on the reverse side. As to warranties and limitation of remedies, paragraph 3 provides:

"The Seller believes that the programming being furnished hereunder is accurate and reliable and when programming

accomplishes the results set forth in the 'Design Specifications,' to be agreed to by the Seller and the Purchaser, such programming will be considered completed."

Paragraph 3 continues in italics:

"However, the amounts to be paid to the Seller under this Agreement and this Addendum do not include any assumption of risk, and the Seller disclaims any and all liability for incidental or consequential damages arising out of the delivery, use or operation of the programs provided herein.

"If the purchaser, without the written consent of the Seller, makes any modification to the programming or any deviations from the operating instructions or violates the provisions of paragraph 2, all warranties set forth herein cease immediately.

"All warranties set forth herein are in lieu of all other warranties, express or implied, including any regarding merchantability or fitness for a particular purpose, arising out of or in connection with any program (or the delivery, use or performance thereof)."

The contract also contains a fourteen-page description of the program applications.

The parties agree that the contract is a sales contract, that the choice of law provision which it contains is valid, and consequently that the parties' rights and liabilities are governed by the Uniform Commercial Code ("UCC") as adopted in California. They agree about very little else.

The defendant contends in its motion for summary judgment that this action is barred by the applicable statute of limitations, that the warranty disclaimer and damage limitation provisions in the contract are valid and binding and therefore the plaintiff is entitled to no relief, and that the plaintiff's second cause of action, which is based not on the UCC but on a negligence tort theory, does not state a cognizable claim. The plaintiff's summary judgment motion consists of a denial of each of those contentions and arguments favoring the application of contrary rules of law at the ultimate trial of this action.

Each of the defendant's contentions, along with the arguments as to the applicable legal principles raised by the plaintiff in opposing defendant's summary judgment motion, is discussed separately below.

### (1) *The Statute of Limitations*

UCC § 2–725 contains a four-year period of limitation governing actions for breach of a sales contract. California has adopted the four-year limitation period, § 2725, Cal. Comm.Code, but Wisconsin has adopted a six-year limitation period, § 402.725, Wis. Stats.

■ The parties agree that normally the forum's statute of limitations will govern the timeliness of a breach of contract action even though the law of a different state is applied under the forum's choice of law rules to the substantive provisions of the contract. *Estate of Schultz*, 252 Wis. 126, 30 N.W.2d 714 (1948); *Air Products & Chemicals, Inc. v. Fairbanks Morse, Inc.*, 58 Wis.2d 193, 206 N.W.2d 414 (1973). In this case, however, the defendant argues, the California statute of limitations should be applied because the contract specifically provides for the application of California law and because § 893.07, Wis.Stats., mandates that the California statute be applied.[2]

Section 893.07 provides in part:

---

**2.** Section 2725(2), Cal.Comm.Code, provides:

"A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues

when the breach is or should have been discovered."

Tender of the computer hardware occurred on April 1, 1975, and there was a ninety-day warranty. Any cause of action relating to the hardware, therefore, would have occurred at the latest on July 1, 1975, and under the California statute of limitations the plaintiff's cause of action, filed in June 1980, would be barred.

"(1) If an action is brought in this state on a foreign cause of action and the foreign period of limitation which applies has expired, no action may be maintained in this state."

The statute was adopted in 1979 and subsection (1) has not been construed in any reported decisions. The Judicial Council Committee's Note states that subsection (1) is an application of § 893.05, Wis.Stats., "that the running of a statute of limitations extinguishes the right as well as the remedy to a foreign cause of action on which an action is attempted to be brought in Wisconsin in a situation where the foreign period has expired." See also *Maryland Casualty Company v. Beleznay*, 245 Wis. 390, 14 N.W.2d 177 (1944). Nevertheless, I believe that the Wisconsin state courts would apply the Wisconsin statute of limitations in the situation here presented.

In general when parties include a provision in their contract as to the governing law, the courts consider that the provision applies only to the substantive law and is not to be deemed to govern the statute of limitations. 78 A.L.R.3d 639, "Choice of Law as to Applicable Statute of Limitations in Contract Actions," § 2[b] at 646. An exception is made when under the governing foreign law the running of the statute of limitations extinguishes the cause of action as well as the remedy. *Id.*, § 2[a] at 643 and § 4[a] at 652. California is not within the exception since under California law the running of a statute of limitations does not extinguish the cause of action but only bars relief:

" * * * The general rule is that the running of the statutory period does not extinguish the cause of action, but merely bars the remedy. That is the law in California. [Citation omitted.] The law of the forum rather than where the obligation arose governs statutes of limitation and their applicability. * * * " *Western Coal & Mining Co. v. Jones*, 167 P.2d 719, 724, 27 Cal.2d 819 (1946).

See also *Wohlgemuth v. Meyer*, 293 P.2d 816, 818–819, 139 Cal.App.2d 326, 328–329 (1956).

Furthermore, Wisconsin's formulation of the borrowing of a foreign statute of limitations as set forth in § 893.07(1) refers to a "foreign cause of action." It is my opinion that the Wisconsin courts would not consider the plaintiff's cause of action "a foreign cause of action" even though the substantive terms of the contract are by California law.

In *Air Products & Chemicals, Inc. v. Fairbanks*, supra, a breach of contract action arising under Article 2 of the UCC involving engines manufactured in Wisconsin and sold to a corporation having its principal place of business in Pennsylvania, the parties and the Court agreed that Pennsylvania law should govern the parties' substantive rights and liabilities under the contract, but the Wisconsin Supreme Court determined that using a "center-of-gravity" or "grouping-of-contacts" approach to conflict of law issues, Wisconsin's six-year statute of limitations rather than Pennsylvania's four-year statute should apply. Unlike this case, in that case the foreign party was the plaintiff in the action and therefore application of Wisconsin's statute of limitations would not affect Pennsylvania's interest in protecting defendants from stale claims. 58 Wis.2d at 203, 206 N.W.2d 414. In reach-

---

With regard to the software, Office Supply points to the language in the contract that "when programming accomplishes the results set forth in the 'Design Specifications,' * * * such programming will be considered completed" (page 4, ¶ 3), and argues that that language creates a warranty extending to future performance, and that the programming did not accomplish the listed results until 1978. For reasons contained in the body of the decision in the section on warranties, in my opinion that language merely designates the time at which the ninety-day warranty period began to run and was not itself a warranty. In a letter dated October 6, 1975, plaintiff's president notified Basic/Four that the programming was completed. The warranty period therefore extended to January 6, 1975, and the plaintiff's complaint would have been untimely under California law.

Even assuming that the contract provisions purporting to exclude and modify warranties are invalid, their invalidity would not affect the time of accrual of a cause of action under § 2725(2), Cal.Comm.Code, and plaintiff's complaint would still be barred in California.

ing its decision, however, the Wisconsin Supreme Court also relied on its conclusions that "Pennsylvania is in no position to in any way influence what Wisconsin feels to be an appropriate period of protection for both itself and defendants from stale lawsuits" and that "by the decision of the legislature to permit aggrieved parties six instead of four years to prosecute their claims, a decision contrary to the recommended period by drafters of the Uniform Commercial Code which was ultimately adopted in Pennsylvania, the legislature determined that the interests of Wisconsin are best advanced by a longer period." 58 Wis.2d at 204, 206 N.W.2d 414.

Furthermore applying the "center-of-gravity" approach to the contract itself in this case compels the conclusion that the plaintiff's cause of action arose in Wisconsin. The contract was negotiated primarily in Wisconsin, was signed by the plaintiff in Wisconsin, called for installation of the computer system in Wisconsin, and provided for the defendant's performance of its express warranty obligations in Wisconsin.

Had the Wisconsin legislature intended under those circumstances that a foreign statute of limitations should govern the action, it could have adopted in § 893.07(1) a reference to "the otherwise applicable law," which in this case would be California's. See the Restatement (Second) of Conflict of Laws § 143. Instead, the legislature chose to adopt the formulation of a "foreign cause of action" which suggests that where the cause of action arises in Wisconsin, Wisconsin's statute of limitations is applicable to it.

■ In sum, in my opinion the plaintiff's cause of action in this case is not a "foreign cause of action" within the meaning of § 893.07(1), Wis.Stats., because although its substantive provisions are governed by foreign law, the parties' most significant contacts involving the contract are with Wisconsin and thus the cause of action arose in Wisconsin and the six-year statute of limitation policy of the State of Wisconsin is applicable to the action and it may proceed.[3] That result also comports with the policy of the State of California that the law of the forum governs statutes of limitation. *Western Coal & Mining Co. v. Jones*, supra.

### (2) *Disclaimer of Warranties*

■ The Office Supply-Basic/Four contract specifically provides that it constitutes the entire agreement and understanding between the parties. That being so, parol evidence is not admissible under California law to vary the terms of the agreement. *APLications, Inc. v. Hewlitt-Packard Co.*, 501 F.Supp. 129 (S.D.N.Y. 1980). The language of the contract must be interpreted in an effort to determine the intent of the contracting parties. *S. M. Wilson & Company v. Smith International, Inc.*, 587 F.2d 1363 (9th Cir. 1978).

If there are no exclusions or modifications in the contract, every sales contract governed by the UCC contains an implied warranty of merchantability and, if the seller has reason to know of a particular purpose for which the goods are required, an implied warranty of fitness for a particular purpose. Section 2315, Cal.Comm.Code. Express warranties are created if the seller makes an affirmation of fact or promise to the buyer and the affirmation becomes part of the bargain between the parties. Section 2313, Cal.Comm.Code. Thus, any express warranties must be found in the language of the contract. Implied warranties, in contrast, will be held to exist unless they are specifically excluded.

With regard to the computer hardware, the contract expressly warrants the hardware to be free from defects in material, workmanship, and operating failure from ordinary use for ninety days after installation. (Page 2, paragraph 3.)

---

**3.** UCC § 1–105 provides that when a transaction bears a reasonable relation to more than one state, the parties may agree that the law of either one or the other shall govern "their rights and duties." The section is codified in § 401.105, Wis.Stats., but no argument has been made that on the statute of limitations issue it adds anything to § 893.07, Wis.Stats., or mandates any result different from the result which obtains under § 893.07.

With regard to the computer software, the most reasonable interpretation of the contract is that the same ninety-day warranty of material, workmanship, and operating failure applies, dating from the time when the "programming accomplishes the results set forth in the 'Design Specifications' " (page 4, paragraph 3), which in this case was on October 6, 1975, when plaintiff's president so advised the defendant.

The plaintiff contends that the language just quoted is a warranty of future performance, and that in fact the programming did not accomplish the desired results until 1978. Courts have been parsimonious in finding warranties of future performance where there is no explicit language in the contract creating such a warranty. *Standard Alliance Industries, Inc. v. Black Clawson Company*, 587 F.2d 813, 820 (6th Cir. 1978). For example, a representation as to the performance ability of an existing product will not be construed as an explicit warranty of future performance ability of the product. *Jones & Laughlin Steel Corporation v. Johns-Manville Sales Corporation*, 626 F.2d 280, 291 (3d Cir. 1980) (interpreting California law). Section 2316(1), Cal.Comm.Code, provides in part:

"(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other, * * *."

The first page of the software addendum (page 3 of the contract) provides that it is incorporated within and made a part of the hardware purchase agreement. That agreement contains the ninety-day express warranty provision which, as a result of the incorporation, also applies to the software purchase. In light of the ninety-day express warranty, the most reasonable construction of the software addendum language regarding the results to be accomplished by the programming is that the completion of the programming and installation of all of the bargained-for applications starts the running of the ninety-day warranty period, and not that the applications are warranted to run perfectly once

their installation is apparently successfully completed.

■ The UCC allows contracting parties to exclude or modify all implied warranties. There is no correlative requirement that if implied warranties are excluded, express warranties must be given. Thus it is permissible, for example, to exclude all implied warranties and to provide for a ninety-day express warranty limited to repair or replacement of defective goods. *APLications, Inc. v. Hewlitt-Packard Co.*, supra (ninety-day express warranty on the sale of a computer system under California law); *Badger Bearing Co. v. Burroughs Corp.*, 444 F.Supp. 919 (E.D.Wis.1977), aff'd, without opinion, 588 F.2d 838 (7th Cir. 1978).

■ In order to make an effective waiver of implied warranties, the provisions of § 2316(2), Cal.Comm.Code, must be followed:

"* * * to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. * * *"

There is no dispute that the language contained in the contract was in this case sufficient to waive all implied warranties. The issue is whether the disclaimer was "conspicuous." Section 1201(10), Cal.Comm.Code, provides:

"(10) 'Conspicuous.' A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. But in a telegram any stated term is 'conspicuous.' Whether a term or clause is 'conspicuous' or not is for decision by the court."

Basic/Four points out that it disclaimed the implied warranties not once but twice, and that the disclaimers were written in itali-

cized print, in contrast to the regular print used on the rest of the contract. Nevertheless, the disclaimers are not conspicuous. In *Dorman v. International Harvester Company*, 46 Cal.App.3d 11, 120 Cal.Rptr. 516 (1975), the California court of appeals noted that under pre-Code California law, disclaimers of warranty are strictly construed, and, applying the code, it found that an attempted disclaimer written in only slightly contrasting print and without a heading adequate to call the buyer's attention to the disclaimer clause was not effective. That decision controls in this case. The two disclaimers in the Office Supply-Basic/Four contract are on the reverse sides of the first two pages of the contract. They are not positioned close to the buyer's signature line. The contracts are printed on pale green paper and the disclaimers are set forth in print which, although italicized, is only slightly contrasting with the remainder of the contract. There are no headings noting the disclaimers of warranty. Since there is only " 'some slight contrasting set-off' " and there is " 'only a slight contrast with the balance of the instrument,' " *Dorman*, supra, 120 Cal.Rptr. at 522, quoting *Woodruff v. Clark County Farm Bureau Coop. Assn.* (1972), 153 Ind.App. 31, 286 N.E.2d 188, 198, quoting in turn *Greenspun v. American Adhesives, Inc.*, 320 F.Supp. 442 (E.D.Pa.1970), therefore, the disclaimers are not conspicuous.

Discussion of the effectiveness of the disclaimer provisions in the contract does not end with the finding of lack of conspicuousness. In their treatise *Uniform Commercial Code* § 12–5 at 444 (2d ed. 1980), Messrs. White and Summers note "with apprehension" the growing number of cases which hold that if a buyer is actually aware of a warranty disclaimer, then the disclaimer is effective even if not conspicuous. See also 73 A.L.R.3d, "Construction and Effect of UCC § 2–316(2) Providing that Implied Warranty Disclaimer must be 'Conspicuous,' " § 5[b], pointing out the same line of cases. The Official Comment to UCC § 2–316 states that the section is designed "to protect a buyer from unexpected and unbargained language of disclaimer."

Pointing to that language, the Court in *Dorman*, supra, 120 Cal.Rptr. at 521–522, indicated that California will follow the trend:

" * * * [W]e must rely predominantly on the official comments to sections 2316 and 1201, subdivision (1), and to foreign law. The official comment to subdivision (10) of section 1201 states that the 'test [of conspicuousness] is whether attention can reasonably be expected to be called to [the disclaimer provision].' (Cf. *Gray v. Zurich Insurance Co.*, 65 Cal.2d 263, 271, 54 Cal.Rptr. 104, 419 P.2d 168.) We must examine this comment in the light of the official comment to section 2316, which states: 'This section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude "all warranties, express or implied." It seeks to protect a buyer from *unexpected* and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise.' (Emphasis added.) In other words, section 2316 seeks to protect the buyer from the situation where the salesman's 'pitch,' advertising brochures, or large print in the contract, giveth, and the disclaimer clause—in fine print—taketh away."

The *Dorman* Court also noted that under pre-Code California law as well, a provision disclaiming implied warranties "was ineffectual unless the buyer assented to the provision or was charged with notice of the disclaimer before the bargain was completed." *Id.*, 120 Cal.Rptr. at 521.

James Bruno testified during his deposition taken on November 3, 1980, that before he purchased the Basic/Four system, he spent approximately two months comparing it with other systems (Tr. at 10), and that he drew up a written comparison of the Basic/Four and Qantel systems, including their guarantees. Basic/Four, 90 days; and Qantel had one year." (Tr. at 30.) He read the back of the contract before he signed it

(Tr. at 52–53), when he received the contract from Basic/Four he made out a list of questions to ask Basic/Four before signing and one subject on his list was the ninety-day guarantee (Tr. at 77–78), and before he signed he showed the warranty provision in the contract to someone he knew in the data processing field (Tr. at 81–82). He discussed the warranties with Basic/Four before signing and tried to have them modified:

"Q Did you read the provisions of the warranty?

"A Yes.

"Q And did you discuss those provisions with Basic/Four, or with someone from Basic/Four?

"A Yes.

"Q And what was said to you about those provisions?

"A That that was the condition that I had to accept.

"Q All right. And was that discussion before or after the contract was signed?

"A I would say before.

\* \* \* \* \* \*

"Q \* \* \* did you call up Darryl Bannister, for example, and say I want to buy this system but I refuse to agree to the warranty provisions in the contract?

"A Well, I argued with him, but it was to no avail. Nothing." (Tr. at 84–85.)

He also was aware of the warranty limitations before he signed the contract:

"Q Well, were you aware of the provisions of that warranty before you signed the contract?

"A That there were limitations?

"Q That there are limitations to the warranty? Were you aware of that?

"A Certainly.

"Q You were?

"A Yes." (Tr. at 87.)

That testimony establishes that the warranty disclaimers were neither unexpected nor unbargained for, and that, consequently, under *Dorman*, they should be enforced.

On December 15, 1981, Basic/Four filed its motion for summary judgment. In opposition to the motion, on January 21, 1982, the plaintiff filed an affidavit signed by Mr. Bruno in which he states:

"3. \* \* \* that there was no statement by the Basic/Four sales executives that they would not stand behind their system after 90 days were up; that affiant did not have these Agreement [sic] reviewed by his attorney, nor was he aware from the documents signed by affiant on 1–31–75 that there were any disclaimers by Basic/Four; \* \* \*."

The plaintiff has offered no explanation of the discrepancy between the affidavit and the deposition testimony. The issue now before the Court, therefore, is whether the discrepancy is sufficient to create a genuine issue of fact for trial as to the plaintiff's awareness of the warranty limitations contained in the contract before it was signed.

■ An affidavit of a witness which conflicts with his deposition testimony should, despite the greater reliability usually attributed to the deposition, be considered on a summary judgment motion in determining if there is a genuine issue for trial. 6 Moore's Federal Practice ¶ 56.22[1] at 56–1325 through 56–1326; 10 Wright and Miller's Federal Practice and Procedure § 2738 at 686; *Adams v. United States*, 392 F.Supp. 1272, 1274, 1275 (E.D.Wis.1975). Summary judgment may nevertheless be granted based upon the deposition testimony if the court is satisfied that the issue created by the affidavit is not "genuine." *Perma Research and Development Company v. Singer Company*, 410 F.2d 572, 578 (2d Cir. 1969); *Radobenko v. Automated Equipment Corporation*, 520 F.2d 540 (9th Cir. 1975); *Farnsworth, McKoane & Co. v. North Shore Savings & Loan Association*, 504 F.Supp. 673, 680 (E.D.Wis.1981); *Dudo v. Schaffer*, 91 F.R.D. 128 (E.D.Pa.1981); *Choudhry v. Jenkins*, 559 F.2d 1085, 1090 (7th Cir. 1977).

In this case it was the president of the plaintiff, and not officers or employees of

the defendant, who testified at deposition long before the summary judgment motion was filed that he knew of the warranty limitations before he signed the contract, tried to get them changed and, when he was unable to do so, signed the contract anyway. It is upon that testimony that the defendant has relied in moving for summary judgment. Thus, this is not a case where the plaintiff can complain of lack of access to material facts or can put forth newly discovered evidence in an effort to defeat summary judgment. *Perma Research and Development Company v. Singer Company*, supra, at 578. He was cross-examined at length about the warranty clauses during his deposition and has failed to explain his change of mind as reflected in his affidavit. *Dudo v. Schaffer*, supra, at 133. In *Radobenko v. Automated Equipment Corporation*, supra, at 544, when confronted with a similar situation, the Ninth Circuit concluded:

"While the facts embraced in these three recitals [made in the plaintiff's affidavit and contradicting his earlier deposition testimony] are both material and relevant to the issues raised by the pleadings, we reject appellants' efforts to characterize them as *genuine* issues of fact. When confronted with the question of whether a party should be allowed to create his own issue of fact by an affidavit contradicting his prior deposition testimony, the Court of Appeals for the Second Circuit held that no *genuine* issue of fact was raised. *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). Therein the Court noted:

" '[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.' 410 F.2d at 578.

"The very object of summary judgment is to separate real and genuine issues from those that are formal or pretended, so that only the former may subject the moving party to the burden of trial. [Citation omitted.] Here we are convinced that the issues of fact created by Radobenko are not issues which this Court could reasonably characterize as genuine; rather, they are sham issues which should not subject the defendants to the burden of a trial. * * * "

In this case the deposition testimony upon which the defendant relies so clearly indicates that the plaintiff knew of the warranty limitations before the contract was signed, and at a minimum discussed the ninety-day provision with the defendant, that the plaintiff should not now be permitted to compel a trial on the issue by filing an affidavit denying the admissions made during the deposition. I therefore conclude that the record establishes that the plaintiff was aware of the warranty limitations before the contract was signed, that no genuine issue of material fact exists on that point, and that under California law the warranty limitation provisions in the contract are therefore valid.

*(3) Limitation of Remedies*

In addition to its exclusion of implied warranties, the contract states that the remedy available to Office Supply is limited to repair or replacement of defective parts and that Basic/Four has no liability for incidental or consequential damages.

Section 2316(4), Cal.Comm.Code, provides:

"(4) Remedies for breach of warranty can be limited in accordance with the provisions of this division on liquidation or limitation of damages and on contractual modification of remedy (Sections 2718 and 2719)."

Section 2719, Cal.Comm.Code, on contractual modification or limitation of remedies, provides in part:

"(1) * * * (a) The agreement may provide for remedies in addition to or in substitution for those provided in this division and may limit or alter the measure of damages recoverable under this division, as by limiting the buyer's remedies to return of the goods and repay-

ment of the price or to repair and replacement of nonconforming goods or parts; and

\* \* \* \* \* \*

"(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. \* \* \* Limitation of consequential damages where the loss is commercial is valid unless it is proved that the limitation is unconscionable."

Office Supply contends that if the exclusion of warranties clause is found to have been invalid because it was not conspicuous, then the limitation on remedies contained in the contract automatically fails as well and the plaintiff may pursue all of the remedies set forth in the code, including its claims for incidental and consequential damages. The argument is without merit. The Code provisions on limitation of damages are set forth in a separate section from that containing the warranty disclaimer provisions, and the section does not require that a limitation on damages, in order to be effective, be conspicuous. See also White and Summers, Uniform Commercial Code, supra, § 12–9 et seq.

The plaintiff also contends, first, that the exclusion of incidental and consequential damages was unconscionable, and second, that the limitation of remedy to repair or replacement of defective parts failed to provide the plaintiff with a functioning computer system and therefore the disclaimer is invalid and plaintiff should be able to pursue all of the remedies available under the Code. The defendant argues that the plaintiff modified the software applications without written consent and therefore the warranty is terminated.

As to the modifications which Ted Templeton of Computer Methods, Inc., made to the system and which plaintiff's own programmer, Marc Jerome, made to the system, paragraph 3 (in italics) of the contract at page 4, relating to additional terms and conditions for the purchase of the software, provides in part:

"If the purchaser, without the written consent of the Seller, makes any modification to the programming \* \* \* all warranties set forth herein cease immediately."

There is no claim that any of the modifications were made prior to the expiration of the warranty period on January 6, 1976. Therefore, if any defects remained in the system as of that date which Basic/Four had failed to correct under its warranty obligation, plaintiff's subsequent modification of the programs would have no effect on its right to recover for those defects.

As for the limitation of remedies, § 2719(2), Cal.Comm.Code, provides:

"(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code."

A repair remedy fails of its essential purpose if the repair is unduly delayed or if there is a total inability to repair:

" \* \* \* so long as the buyer has the use of substantially defect-free goods, the limited remedy should be given effect. But when the seller is either unwilling or unable to conform the goods to the contract, the remedy does not suffice. \* \* "

*Chatlos Systems, Inc. v. National Cash Register Corporation (NCR Corporation)*, 635 F.2d 1081, 1085 (3d Cir. 1980).

If a repair remedy fails of its essential purpose, then under § 2714(2), Cal.Comm. Code, the buyer may recover what is the basic measure of damages for breach of warranty under the Code, i.e., "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted."

If a remedy fails of its essential purpose, in addition to breach of the bargain damages allowed under § 2714(2), incidental and consequential damages may also be recovered in a proper case. Section 2714(3), Cal.Comm.Code. If a remedy is limited to repair and consequential and incidental damages are excluded, however, then even if the repair remedy fails of its essential purpose, the buyer is limited to his breach of the bargain damages under

§ 2714(2) unless he can prove that the exclusion of incidental and consequential damages was unconscionable under § 2719(3), Cal.Comm.Code. In other words, an exclusion of incidental and consequential damages is a contract provision separate and distinct from a limitation of remedy to repair, and must receive separate consideration. *Chatlos Systems, Inc. v. National Cash Register Corporation (NCR Corporation)*, supra, at 1086; *S. M. Wilson & Company v. Smith International, Inc.*, supra, at 1374–1376.

Office Supply has the burden of proving that the exclusion of incidental and consequential damages was unconscionable. Section 2719(3), Cal.Comm.Code. The exclusion is presumed valid in a commercial setting. *Id.*; White and Summers, Uniform Commercial Code, supra, § 12–11 at 473–475. Among the factors relevant to determining unconscionability are the length of the negotiation process, the length of time the buyer has to deliberate before signing the contract, the experience or astuteness of the parties, whether counsel reviewed the contract, and whether the buyer was a reluctant purchaser. *Earman Oil Company, Inc. v. Burroughs Corporation*, 625 F.2d 1291 (5th Cir. 1980). The commercial setting and the purpose and effect of the allegedly unconscionable clause are also relevant, *Badger Bearing Co. v. Burroughs Corp.*, 444 F.Supp. 919 (E.D.Wis.1977), aff'd without opinion, 588 F.2d 838 (7th Cir. 1978), as is the extent of the seller's default in attempting to fulfill its obligations on a remedy to repair, *S. M. Wilson & Company v. Smith International*, supra, at 1375.

Basic/Four argues that summary judgment on the unconscionability issue is appropriate in this case because Office Supply negotiated with a number of computer sellers before settling on Basic/Four, it achieved a price concession on a disc drive from Basic/Four, it viewed several computer systems installed by Basic/Four before deciding to purchase, James Bruno convened a meeting of the board of directors to consider the purchase, and he held the contract for almost a week before deciding to sign it.

The plaintiff, on the other hand, contends that no one at Office Supply had any familiarity with computer systems and consequently Office Supply relied extensively on the claims of the Basic/Four salesmen as to the performance capabilities of the proposed system, and particularly on the "guarantee" made in a presentation to the board of directors that the software system would be "flawless." Office Supply did not have an attorney review the contract.

Mr. Bruno testified during his deposition that in November 1974, Office Supply decided to purchase a mini computer (Tr. at 9). Thereafter he primarily on behalf of Office Supply and also David Carlson to some extent spent about two months contacting manufacturers and comparing various systems. In addition to Basic/Four, he looked at Qantel, Wang, Micro Data, and Data Point (Tr. at 10 and 17–19). He drew up for his own use a written comparison of the Basic/Four and Qantel products and consulted with a computer systems acquaintance at a bank as to what questions he should be asking (Tr. at 29–31). He attended some systems demonstrations, and for a period Qantel and Basic/Four engaged in an active competition to sell Office Supply a system (Tr. at 35 and 58). As an incentive, Basic/Four offered to give Office Supply a double capacity disc at no extra charge (Tr. at 36).

After Office Supply decided to buy from Basic/Four, and after Bruno received the contract in the mail from Basic/Four, he showed the contract to someone he knew in the data processing field and prepared a list of questions to ask Basic/Four before signing (Tr. at 81–82). He also attempted to negotiate the warranty provision with Basic/Four but could not obtain any concessions (Tr. at 84–85). After receiving the contract but before signing it, he also convened a meeting of the Office Supply board of directors to consider the Basic/Four offer and to hear a sales presentation from a Basic/Four salesman (Tr. at 44–45 and 54–58). The following day Bruno signed the contract and mailed it back to Basic/Four.

The parties in this case did not have equal sophistication in the data processing field, and Basic/Four is a much larger commercial operation. Nevertheless, the plaintiff is also an established commercial operation of significant size, and the plaintiff's president testified during his deposition that he is accustomed to engaging in contract negotiation on behalf of Office Supply. The plaintiff instituted negotiations with Basic/Four and engaged in a two-month period of comparative shopping. Basic/Four was not the only available source of the product which the plaintiff desired, and there was active competition amongst computer manufacturers to sell the plaintiff a system. The plaintiff took its time in deciding to purchase and was not prevented by Basic/Four from thoroughly investigating the system and examining the contract provisions. See *Delta Air Lines, Inc. v. Douglas Aircraft Company, Inc.*, 238 Cal.App.2d 95, 47 Cal.Rptr. 518 (1966); *Earman Oil Company, Inc. v. Burroughs Corporation*, 625 F.2d 1291, 1299–1300 (5th Cir. 1980); *Badger Bearing Company v. Burroughs Corporation*, 444 F.Supp. 919, 923 (E.D.Wis.1977), aff'd, without opinion, 588 F.2d 838 (7th Cir. 1978). There was no atmosphere of haste or undue pressure exerted on the plaintiff to compel it to enter into the contract. Cf., *Industralese Automated & Scientific Equipment Corporation v. R. M. E. Enterprises, Inc.*, 58 A.D.2d 482, 396 N.Y.S.2d 427, 432 (1977). Furthermore, it is undisputed that during the warranty period Basic/Four did make numerous efforts to repair all defects asserted by the plaintiff to exist in the system, even though the plaintiff contends that the efforts were not successful, and even after the warranty period expired that Basic/Four continued its efforts to resolve any problems raised by the plaintiff. See *S. M. Wilson & Company v. Smith International, Inc.*, 587 F.2d 1363, 1375 (9th Cir. 1978).

■■■■ In a commercial setting a damages limitation clause is presumed to be valid under California law, § 2719(3), and the contracting parties are presumed to act at arms length. *Earman Oil Company, Inc. v. Burroughs Corporation*, supra, at 1300.

Relying upon the deposition testimony of the plaintiff's president, the defendant has presented evidence which, if unrebutted, would establish that the damages limitation clause was not unconscionable under the circumstances of this case. While with respect to the issue of unconscionability a party should be permitted to present evidence as to the commercial setting in which the contract was made and the purpose and effect of the limitation clause, *Badger Bearing Co. v. Burroughs Corp.*, supra, 444 F.Supp. at 923, when confronted with a summary judgment motion a party must do more to defeat it than rely upon "the vague hope that something may turn up at trial." *Perma Research and Development Company v. Singer Company*, supra, at 578; 10 Wright and Miller's Federal Practice and Procedure § 2739 (1973). In this case, the plaintiff having made no effort to controvert the defendant's proof, summary judgment on the issue of unconscionability is appropriate.

The plaintiff's final hope for the recovery of damages is to prove that the repair and replacement remedy provided for in the contract "failed of its essential purpose," § 2719(2), Cal.Comm.Code, which would entitle plaintiff to present evidence of the difference between what the system was worth at the time it was accepted and what it would have been worth had it been as warranted, § 2714(2), Cal.Comm.Code.

■■■■ As previously stated, the remedy of repair and replacement is deemed to fail of its essential purpose when the goods which the buyer purchases are not substantially defect free, and in addition the seller is unable or unwilling to conform the goods to the contract. *Chatlos Systems, Inc. v. National Cash Register Corporation (NCR Corporation)*, supra, 635 F.2d at 1085. See also *S. M. Wilson & Company v. Smith International, Inc.*, supra; *Tokio Marine and Fire Insurance Company, Limited v. McDonnell Douglas Corporation*, 617 F.2d 936 (2d Cir. 1980).

In *Chatlos*, a UCC case involving a computer sale, the Court found that the repair

remedy failed of its essential purpose where the buyer contracted for six software applications to be fully operational within six months after installation and to which a sixty-day repair warranty applied, and after one year only one application was operational, and after one and one-half years less than half the applications were operational. As the court stated at page 1085:

" * * * Viewed from the buyer's standpoint, the repair remedy's aim is to provide goods that conform to the contract for sale and do so at an appropriate time. A delay in supplying the remedy can just as effectively deny the purchaser the product he expected as can the total inability to repair. In both instances the buyer loses the substantial benefit of his purchase."

Despite repeated attempts to repair, after a year and a half the seller had been unable to provide to the buyer the product for which the buyer had contracted.

In *Tokio Marine*, an airplane purchase case arising under California law, a one year or 2,500 flying hours repair remedy was held not to have failed of its essential purpose where the goods were apparently defect free at the conclusion of the warranty period and the seller was not asked during that period to repair or replace the allegedly defective part which later caused a crash.

In *S. M. Wilson*, involving the purchase of a tunnel boring machine and arising under California law, the seller did not contest that the machine malfunctioned from the outset, and the seller was never able to repair it. The Court, therefore, found that the repair remedy failed of its essential purpose.

In this case Office Supply contracted for four software applications and all four of them were installed. (Bruno deposition at 109–110.) On October 6, 1975, Mr. Bruno wrote to Basic/Four that all four of the applications were operational and appeared to be satisfactory. (Exhibit E to plaintiff's memorandum in support of motion for summary judgment, filed December 15, 1981.) In the first week of November 1975, the October monthly statement of customer accounts in the accounts receivable application printed out of balance. (Bruno deposition at 43.) Mr. Carlson testified that as a result of that problem approximately 20% of the accounts receivable were out of balance, and the system was therefore only 78% operational.[4] (Carlson deposition at 63.) Basic/Four worked on the problem, which continued through 1975, and finally in February 1976, the monthly statement printed through correctly. (Bruno deposition at 135.) Thereafter, both Mr. Bruno and Mr. Carlson testified, the accounts receivable application continued to cause intermittent problems until early 1978 when it was finally corrected by Marc Jerome, Office Supply's own programmer. (Bruno deposition at 136; Carlson deposition at 46.) The accounts receivable problem was, Mr. Bruno testified, the one significant defect left in the system at the expiration of the warranty period on January 6, 1976. (Bruno deposition at 87, 132–134, and 142.) Both men testified that while problems occurred with the hardware, the problems were always corrected either by Basic/Four or by Sorbus with a few minimal exceptions pursuant to the maintenance contract. (Bruno deposition at 121; Carlson deposition at 38 and 78.)

Marc Jerome prepared a report identifying three significant defects which he found in the software applications when he began work at Office Supply in early 1978. (Exhibit FF to the Bruno affidavit filed January 21, 1982.) One was in the ABC program, one in the B0 and B2 programs, and one in the UJ program. (Jerome report and deposition, Tr. at 47–49 and 62.) Only the UJ program was installed by Office Supply. (Affidavit of Elliot Stein filed February 3, 1982.) Furthermore, the defect identified by Jerome in the UJ program, which is part of Basic/Four's accounts receivable software application, did not exist in that program in July 1976, meaning that it must

---

4. Mr. Bruno testified that between the hardware and software problems, the figure was 50%. He also stated that the figure was "[j]ust a guess." (Tr. at 114.)

have been introduced into the program after that date. (Affidavit of Elliot Stein filed February 3, 1982.) It is not disputed that commencing soon after the warranty period expired and continuing up to the present, both Ted Templeton of Computer Methods, Inc. and Marc Jerome have made extensive modifications to the programs on Office Supply's computer system. Finally, between March 1976 and March 1978, Basic/Four apparently received no complaints from Office Supply about the functioning of the software applications. (Exhibit GG to the Bruno affidavit filed January 21, 1982.)

■ The inference suggested by the evidence which has been presented both in support of and in opposition to the summary judgment motion is that while Office Supply may have had problems with the accounts receivable program starting in November 1975 and continuing through early 1978, the problems did not all result from the same defect in the program but rather resulted from at least two different defects, one of which was corrected by Basic/Four before the accounts were printed out in February 1976, and another of which was introduced into the program some time after July 1976. Consequently, the conclusion results that Basic/Four did make the repairs which it was obligated by the contract to make, that the repairs cured the defect then existing in the accounts receivable program, and that Basic/Four did fulfill its warranty obligations during the warranty period. *S. M. Wilson & Company v. Smith International, Inc.,* supra, at 1375.

The underlying purpose of the summary judgment procedure is—

"* * * to pierce the pleadings so that the burden and expense of a trial will not be wasted on baseless claims or phantom issues. * * * Accordingly, * * * the party opposing the summary judgment motion does not have the right to withhold his evidence until trial; nor can he demand a trial because of the speculative possibility that a material issue of fact may appear at that time. * * *" 10 Wright and Miller's Federal Practice and Procedure § 2739 at 715–716.

See also *Perma Research and Development Company v. Singer Company,* supra, at 578. Mr. Bruno and Mr. Carlson testified that the accounts receivable program had problems from November 1975 through early 1978. They admitted that they were unqualified to make a more explicit identification of the cause of the problems or to testify as to whether or not any of the problems might have been caused by Templeton or Jerome and not by Basic/Four. Templeton admitted that he might have made some modifications to the accounts receivable program starting in the spring of 1976. (Templeton deposition at 95 and 101.) The evidence establishes that the defects which Marc Jerome identified could not have been caused by Basic/Four. Under the circumstances, there exists only the "speculative possibility" that Office Supply could come up with evidence at trial to show that a defect remained in the software at the end of the warranty period. The evidence presently in the record proves otherwise, and the "speculative possibility" is insufficient to justify putting the defendant through the burden and expense of a trial.

*(4) Negligence*

The plaintiff's second cause of action alleges that Basic/Four was negligent in its manufacture, design, installation, and repair of the computer system and seeks damages caused by that negligence. The cause of action must be dismissed.

■ Under California law economic losses are not recoverable in tort. The rationale is explained in *S. M. Wilson & Company v. Smith International, Inc.,* supra, at 1376:

"Where the suit is between a nonperforming seller and an aggrieved buyer and the injury consists of damage to the goods themselves and the costs of repair of such damage or a loss of profits that the deal had been expected to yield to the buyer, it would be sensible to limit the buyer's rights to those provided by the Uniform Commercial Code. [Citations

omitted.] To treat such a breach as an accident is to confuse disappointment with disaster. Whether the complaint is cast in terms of strict liability in tort or negligence should make no difference.

"In a somewhat curious way California law achieves this result by limiting the type of losses recoverable under an action in negligence. Economic losses are not recoverable under negligence. *Seely v. White Motor Co.,* 63 Cal.2d 9, 18, 45 Cal. Rptr. 17, 23, 403 P.2d 145, 151 (1965) fixed the rule and it frequently has been followed. * * * It serves to limit the parties' rights to those provided by the Uniform Commercial Code, a body of law specifically designed to deal with commercial disputes between sellers and buyers of goods."

See also *Jones & Laughlin Steel Corporation v. Johns-Manville Sales Corporation,* 626 F.2d 280, 284–289 (3d Cir. 1980).

*Plaintiff's Discovery Motion*

On May 20, 1981 and June 11, 1981, respectively, the plaintiff served on the defendant a set of interrogatories and a demand for the production of documents. From then until December 3, 1981, when the plaintiff filed its motion to compel discovery with regard to those two demands, the defendant never responded. In mid-December the defendant served answers to the interrogatories and made available certain documents to the plaintiff. The plaintiff contends that one document was not produced and that answers to various of the interrogatories were inadequate.

In light of the disposition of the defendant's summary judgment motion made above, I have examined the plaintiff's discovery demands for the sole purpose of deciding whether equity requires that further responses be provided by the defendant and that the plaintiff be given an opportunity to supplement the record prior to judgment being entered on the summary judgment motion.

(a) *Plaintiff's Demand for Production*

The only document which defendant has not produced is a UJ program listing containing the handwritten notations of Marc Jerome which was given by Mr. Jerome to one of defendant's employees, Robert Krenkel, early in 1978. The defendant states in its answering brief that Mr. Krenkel is no longer an employee, that his current whereabouts are unknown, and that a search of the defendant's files has not turned up the document. Under the circumstances, it cannot be produced.

(b) *Plaintiff's Demand for Interrogatory Responses*

The plaintiff continues to seek responses to interrogatories 2–A, 2–B, 2–C, 2–D, 3, 5, 7, and 10.

Interrogatories 2–A, 2–B, 2–C, and 2–D ask for copies of the applications software which was provided by Basic/Four to Office Supply, a step-by-step explanation of the meaning of each instruction contained in each program, a copy of each modification made to the program to adapt it to the needs of Office Supply, and an explanation of the purpose of each modification. Office Supply received prepackaged rather than customized programs from Basic/Four plus a certain number of hours of modification to suit the prepackaged programs to Office Supply's needs. During the oral argument held on March 15, 1982, Basic/Four's counsel stated, and Office Supply did not dispute, that no record of the modifications made to the programs has been retained either by Basic/Four or by Office Supply. Consequently, Basic/Four could at this point supply to Office Supply a set of discs containing the same prepackaged programs, but they would not aid the Court or the plaintiff in determining if there were defects remaining in Office Supply's programs at the end of the ninety-day warranty period.

Interrogatory 3 asks about the installation of the system and was apparently answered to plaintiff's satisfaction except that the names and addresses of the employees of Basic/Four who worked on the installation were not provided. Interrogatory 5 again asks about the prepackaged

software applications which were provided. Interrogatory 7 asks about service calls made by the defendant, and the plaintiff contends that it has made available to the plaintiff all relevant documents which it has available, except those relating to Sorbus service calls, which would have reference to the hardware. Interrogatory 10 asks for the names of defendant's employees who worked on preparing the programs for the plaintiff's system.

It is possible that a complete answer to interrogatory 7 might have provided the plaintiff with relevant information about work performed by Basic/Four on the software during the warranty period. Since the plaintiff's motion to compel discovery was not filed until three months after the date for completion of discovery had passed (see the stipulation and order filed June 11, 1981, providing for a discovery cutoff date of August 15, 1981), and since the plaintiff apparently made no other efforts to conduct discovery until one month after the defendant's summary judgment motion was filed when it obtained leave of court to depose Mr. Templeton, and since the defendant in December 1981 did produce documents which provided at least a partial response to the interrogatory and the main deficiency of which apparently related to the computer hardware and not to the software, I am satisfied that the plaintiff would not have benefitted significantly from a more timely response to the interrogatories, and that justice does not now require that a decision on the defendant's motion be held in abeyance pending supplementation by the defendant of its responses to the plaintiff's interrogatories. The motion to compel will therefore be denied.

### ORDER

For the foregoing reasons,

IT IS ORDERED that the plaintiff's motions to compel discovery and for partial summary judgment are denied.

IT IS FURTHER ORDERED that the defendant's motion for summary judgment is granted, and that judgment be entered dismissing this action with prejudice and awarding costs to the defendant.